UNITED STATES of America, Plaintiff,

v.

EL PASO NATURAL GAS COMPANY and Pacific Northwest Pipeline Corporation, Defendants.

Civ. A. No. C-2626.

United States District Court, D. Colorado.

June 16, 1972.

On Motion to Reinstate Decree Aug. 30, 1972.

822

Richard W. McLaren, Asst. Atty. Gen., John H. Dougherty, Joseph J. Saunders, Dept. of Justice, Washington, D. C., James L. Treece, U. S. Atty., Carolyn J. McNeill, Asst. U. S. Atty., Denver, Colo., for plaintiff.

Leon M. Payne, P. Dexter Peacock, Andrews, Kurth, Campbell & Jones, Houston, Tex., G. Scott Cuming, Gen. Counsel, El Paso Natural Gas Co., El Paso, Tex., E. G. Najaiko, Asst. Gen. Counsel, Houston, Tex., David F. Mackie, El Paso Natural Gas Co., El Paso, Tex., for defendants.

Gary Nelson, Atty. Gen., State of Ariz., Phoenix, Ariz., for intervenor State of Arizona ex rel. The Arizona Corp. Comm.

Nicholas H. Powell, Snell & Wilmer, Phoenix, Ariz., for intervenor Arizona Public Service Co.

A. Y. Holesapple, Holesapple, Conner, Jones, McFall & Johnson, Tucson, Ariz., for intervenor Tucson Gas & Electric Co.

Louis H. Callister, Callister, Kesler & Callister, Salt Lake City, Utah, for intervenors Arizona Public Service Co. and Tucson Gas & Electric Co.

John T. Miller, Washington, D. C., Frederic L. Kirgis, Gorsuch, Kirgis,

Campbell, Walker & Grover, Denver, Colo., for intervenor State of Arizona ex rel. Arizona Corp. Comm., Arizona Public Service Co. and Tucson Gas & Electric Co.

Evelle J. Younger, Atty. Gen., Iver E. Skjeie, Deputy Atty. Gen., State of Cal., Sacramento, Cal., for intervenor People of the State of California.

James E. Faust, Salt Lake City, Utah, for intervenor California Pacific Utilities Co.

Sheldon Rosenthal, San Francisco, Cal., for intervenor Public Utilities Comm. of the State of California.

Richard B. Hooper, Wilbert C. Anderson, Jones, Grey, Kehoe, Bayley, Hooper & Olsen, Seattle, Wash., for intervenor Cascade Natural Gas Co.

Duke W. Dunbar, Atty. Gen., John E. Archibold, Robert E. Commins, Asst. Attys. Gen., Denver, Colo., for intervenor State of Colorado ex rel. Colorado Public Utilities Comm.

Paul W. Williams, Don B. Stookey, Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for intervenor The Committee of El Paso Natural Gas. Co. Institutional Bond and Debenture Investors.

W. Anthony Park, Atty. Gen., State of Idaho, Boise, Idaho, Idaho Public Utilities Commission c/o Marilyn Bourner, Secretary, Boise, Idaho, for State of Idaho ex rel. Idaho Public Utilities Comm.

Larry D. Ripley, Sp. Asst. Atty. Gen., Elam, Burke, Jeppesen, Evans & Boyd, Boise, Idaho, for intervenor, State of Idaho ex rel. Idaho Public Utilities Comm.

Claude Marcus, Marcus & Marcus, Boise, Idaho, for intervenor Intermountain Gas Co.

Joseph S. Jones, Salt Lake City, Utah, John Crawford, Jr., Secretary and Gen. Counsel, Mountain Fuel Supply Co., Salt Lake City, Utah, for intervenor Mountain Fuel Supply Co.

Robert List, Atty. Gen., State of Nevada, Carson City, Nev., for intervenor Public Service Comm. of Nevada.

David L. Norvell, Atty. Gen., of New Mexico, Santa Fe, N. M., William J. Cooley, Joel B. Burr, Jr., Agency Asst. Attys. Gen., Farmington, N. M., for intervenor New Mexico Public Service Comm.

Harold W. Pierce, Portland, Or., for gon, Dept. of Justice, Salem, Or., Rich-

Lee Johnson, Atty. Gen., State of Oregon, Dept. of Justice, Salem, Or., Richard W. Sabin, Asst. Atty. Gen., State of Oregon, Salem, Or., for intervenor State of Oregon ex rel. The Public Utility Com'r of Oregon.

Malcolm H. Furbush, Daniel E. Gibson, Joseph S. Englert, Jr., Pacific Gas and Electric Co., San Francisco, Cal., for intervenor Pacific Gas & Electric Co.

David R. Pigott, Donald J. Richardson, Jr., Chickering & Gregory, San Francisco, Cal., for intervenor San Diego Gas & Electric Co.

Rollin E. Woodbury, Vice Pres. & Gen. Counsel, Rosemead, Cal., R. Clyde Hargrove, Shreveport, La., for Southern California Edison Co.

John Ormasa, W. H. Owens, Southern California Gas Co., Los Angeles, Cal., for intervenor Southern California Gas Co.

Charles H. McCrea, Vice Pres. and Gen. Counsel, Lawrence V. Robertson, Jr., Gen. Atty., Las Vegas, Nev., for intervenor Southwest Gas Corp.

Edward F. Richards, Gustin & Richards, Salt Lake City, Utah, for intervenor Utah Gas Service Co.

Vernon B. Romney, Atty. Gen., Joseph P. McCarthy, H. Wright Volker, Asst. Attys. Gen., Salt Lake City, Utah, for intervenor Utah Public Service Comm.

John W. Chapman, Cartano, Botzer & Chapman, Seattle, Wash., for intervenor Washington Natural Gas Co.

Slade Gorton, Atty. Gen., Frank P. Hayes, Robert E. Simpson, Asst. Attys. Gen., Olympia, Wash., for intervenor Washington Utilities and Transmission Comm.

Robert L. Simpson, Paine, Lowe, Coffin, Herman & O'Kelly, Spokane, Wash., A. Wally Sandack, Draper, Sandack & Saperstein, Salt Lake City, Utah, for intervenor Washington Water Power Co.

Don M. Empfield, Sp. Asst. Atty. Gen., State of Wyoming, Cheyenne, Wyo., for intervenor Public Service Comm. of Wyoming.

Gordon Gooch, Gen. Counsel, George P. Lewnes, Asst. Gen. Counsel, John P. Mathis, F. P. C., Washington, D. C., for Federal Power Comm., amicus curiae.

James D. Voorhees, Moran, Riedy & Voorhees, Denver, Colo., A. John Cressey, Vice Pres. and Gen. Counsel, Minneapolis, Minn., William R. Connole, Connole & O'Connell, Washington, D. C., for Banister Continental Corp.

David K. Watkiss, Pugsley, Hayes, Rampton & Watkiss, Salt Lake City, Utah, James D. McKinney, Jr., Ross, Marsh & Foster, Washington, D. C., C. H. McCall, Houston, Tex., John W. Hammett, Charles F. White, Oklahoma City, Okl., for The Alaska Interstate Apco-Gulf Tipperary Group.

Walter W. Sapp, Vice Pres. and Gen. Counsel, Colorado Springs, Colo., James L. White, Robert T. Connery, David G. Owen, Holland & Hart, Denver, Colo., for Colorado Interstate Corp.

Jefferson D. Giller, Howard Wolf, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., Jack Ware, Uvalde, Tex., for Copaco, Inc.

Marvin J. Bertoch, Ray, Quinney & Nebeker, Salt Lake City, Utah, George S. Dibble, Jr., c/o Husky Oil Ltd., Cody, Wyo., Royce H. Savage, Boone, Ellison & Smith, Tulsa, Okl., for Husky Oil Ltd.

C. Keefe Hurley, Earle C. Cooley, Hale & Dorr, Boston, Mass., Brigham E. Roberts, Rawlings, Roberts & Black, Salt Lake City, Utah, for Paradox Production Corp.

Benjamin H. Parkinson, Jr., Ackerman, Johnston, Norberg & Parkinson, San Francisco, Cal., Hugh J. McClearn,

Van Cise, Freeman, Tooley & McClearn, Denver, Colo., J. Evans Attwell, Lynn R. Coleman, Vinson, Elkins, Searls & Smith, Houston, Tex., J. Donald Brinkerhoff, U. S. Natural Resources, Inc., Menlo Park, Cal., Edward O. Werner, Hardy, Peal, Rawlings & Werner, New York City, Robert Paradise, The Ralph M. Parsons Co., Los Angeles, Cal., for Western Sunset Transmission Co.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION and DECREE

CHILSON, District Judge.

This case was brought in the District of Utah, Central Division as Civil Action No. 143–57, upon motion by the State of Idaho. The Court, on October 7, 1970, entered an order for transfer of the action to the United States District Court for the District of Colorado, pursuant to Title 28 U.S.C. § 1404(a).

## PRELIMINARY STATEMENT

For the convenience of Court and counsel, we again briefly review the background of this litigation.

A more detailed account is found in three decisions of the Supreme Court: California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed. 2d 54; United States v. El Paso Natural Gas Co. et al., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12; Cascade Natural Gas Corp. v. El Paso Natural Gas Co., et al., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed. 2d 814 (Referred to as Cascade).

Prior to the year, 1954, El Paso Natural Gas Company (El Paso) was engaged in the business of transporting natural gas interstate to the California border for sale to distributors who distributed the gas to users in Southern California. At that time, El Paso was the sole out-of-state supplier to the California market.

In 1954, Pacific Northwest (PNW) received the approval of the Federal Power Commission to construct and operate a pipeline from the San Juan Basin in New Mexico to the State of Washington to supply gas to the then unserved Pacific Northwest area. The pipeline was completed and service was begun in 1956.

PNW had obtained authorization to receive large quantities of Canadian gas and, in addition, had acquired Rocky Mountain gas reservoirs along its route and gas reserves in the San Juan Basin. In 1954, PNW tried to enter the rapidly expanding California market by transportation of Canadian gas to Pacific Gas & Electric Co. (PG & E) in Northern California, and the effort was renewed in 1955. In 1966, PNW negotiated with Southern California Edison Co. (Edison) to supply it with natural gas.

Although PNW had no pipeline into California and its efforts to enter the California market were unsuccessful, these efforts were a substantial competitive factor in the California market and led to a price reduction and other concessions to the ultimate benefit of Edison.

El Paso had been interested in acquiring PNW since 1954. The first offer from El Paso was in December 1955, an offer PNW rejected. Negotiations were resumed by El Paso in the summer of 1956, while PNW was still trying to obtain entry to the California market.

In November of 1956, El Paso offered to exchange El Paso shares for PNW shares. This offer was accepted by PNW directors and by May 1957, El Paso had acquired 99.8 percent of PNW's outstanding stock.

In July 1957, the Department of Justice filed suit against El Paso in the U. S. District Court for the District of Utah charging that the stock acquisition violated Section 7 of the Clayton Act.

In August 1957, El Paso applied to the Federal Power Commission for permission to acquire the assets of PNW, and on December 23, 1959, the Commission approved the merger of PNW with El Paso and it was effected on December 31, 1959. California, an intervenor in the proceedings, obtained a review by the Court of Appeals, which affirmed

the Commission (111 U.S.App.D.C. 226, 296 F.2d 348). The Supreme Court granted certiorari and set aside the Commission's approval, holding that it should not have acted until the District Court had passed on the Clayton Act issues. California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901, 8 L. Ed.2d 54 (supra).

Meanwhile, (in October 1960) the United States amended its complaint in the District Court so as to include the asset acquisition by merger in the charge of violation of the Clayton Act. Upon trial of this action, the District Court found for El Paso; the U. S. appealed; the Supreme Court, on review of the record which was composed largely of undisputed evidence, concluded that the effect of the acquisition "may be substantially to lessen competition" within the meaning of Section 7 of the Clayton Act, reversed the judgment and remanded with directions to the District Court "to order divestiture without delay." United States v. El Paso Natural Gas Company et al., 376 U.S. p. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (supra).

Upon the remand to the District Court, motions to intervene by the State of California, Southern California Edison Company, (Edison) and Cascade Natural Gas Company (Cascade Company) were denied, and the District Court entered a decree of divestiture which had been agreed to by the Department of Justice and El Paso.

California, Edison, and Cascade Company appealed from the denial of their motions to intervene. The Supreme Court in Cascade (386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814) reversed the District Court and remanded with directions to allow each appellant to intervene as a matter of right and that the proceedings be reopened to give California, Edison, and Cascade Company an opportunity to be heard as intervenors.

The Court also held that the agreed decree, entered by the District Court, was not in accord with the Supreme Court's mandate in 376 U.S. 651, 84 S. Ct. 1044, 12 L.Ed.2d 12 (supra) which required that PNW, or a new company, be at once restored to a position where it could compete with El Paso in the California market; ordered the District Court to vacate the orders of divestiture previously entered; "have de novo hearings on the type of divestiture" the Court envisioned and made plain in its opinion in 376 U.S. 651, 84 S.Ct. 1044; directed ". . . there be [a] divestiture without delay"; suggested guidelines that should be followed in ordering the divestiture and ordered that a different District Judge be assigned to hear the case.

On April 18, 1967, the undersigned was assigned to the District of Utah to conduct the further proceedings required by Cascade. During the years 1967 and 1968, this Court conducted "de novo hearings" including extensive evidentiary hearings in which the plaintiff, defendant, the Federal Power Commission as Amicus Curiae, twenty-two intervenors and nine applicants for acquisition of the properties to be divested, appeared and participated.

On June 21, 1968, the Court entered tentative Findings of Fact, Conclusions of Law and Opinion which with some modifications were made a final judgment of the Court on August 29, 1968, hereafter referred to as the 1968 Decree.[1]

Minor amendments were thereafter made, the last of which were entered November 7, 1968, as which time, the Findings, Conclusion and Opinion became the final judgment of this Court. The 1968 Decree is incorporated into these proceedings by reference as many of the findings of fact contained therein are pertinent to the present proceedings.

The 1968 Decree dealt with many matters and details necessary to the accomplishment of a divestiture. The variety of questions presented to and deter-

---

1. United States v. El Paso Natural Gas Company, 291 F.Supp. 3 (D.Utah 1968).

mined by the Court in the *1968 Decree* is illustrated by the "TABLE OF CONTENTS" which was a part of that Decree and which is here reproduced for ready reference to that Decree.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION

TABLE OF CONTENTS

|  | Page |
|---|---|
| Preliminary Statement | 1–5 |
| Proceedings Since Cascade | 5(a)–5(b) |
| Summary of Plans | 6–24 |
| Cascade Guidelines and Questions for Determination | 45–47 |
| Property to be Divested: | 25–62 |
| Physical Assets | 25 |
| Gas Sales Agreements | 25 |
| Investments | 25 |
| Gas Reserves | 26–44 |
| West Coast and Northwest Production Company Stock | 48–49 |
| Tax Loss Carry Over | 50–53 |
| Mobil Notes | 53–54 |
| Inter-Company and Miscellaneous Contracts: | 55–61 |
| Sumas Exchange Agreement | 55 |
| Colorado Interstate Agreement | 56–57 |
| 100–100–100–60–40 Contract | 58 |
| Kingsgate Exchange | 59 |
| San Juan Gas Gathering Agreement | 60 |
| Jackson Prarie Field Storage Project | 60–61 |
| To Whom the Assets are to be Divested: | 62–75 |
| Competition 1967 vs. 1957 | 64–67 |
| Selection of Successful Applicant | 68–70 |
| Should CIG Be Excluded for Competitive Reasons? | 70–75 |
| How the Property is to be Divested: | 76–80 |
| Basis for Reimbursement | 77 |
| How Reimbursement Will be Made | 78 |
| Provisions for Insulation from El Paso Control | 79 |
| Time for Divestment | 79 |
| Divestment by CIG of El Paso Stock | 80 |
| Employment of Operating Employees in the Northwest Division | 80 |
| Procedure to Implement Plan. | 81–85 |

When the Supreme Court rejected the *1968 Decree* in *Utah* (Utah Commission v. El Paso Gas Company, 395 U.S. 464, 89 S.Ct. 1860, 23 L.Ed.2d 474) it *found* the Decree did not comply with the Mandate of *Cascade* in two respects:

(a) in the apportionment of gas reserves; and

(b) The Decree did not provide for complete divestiture in that the plan adopted by the Court did not sever all managerial and financial connections between El Paso and the New Company and that such severance was required to satisfy the Mandate of *Cascade*.

The Supreme Court in remanding the case for further proceedings in these two respects, directed the District Court;

". . . in light of the reallocation, [of gas reserves], to reopen consideration of which applicant should acquire New Company. Such consideration should, of course, include whether an award to a particular applicant will have any anti-competitive effects either in the California market or in other markets."

The Supreme Court found no other deficiencies in the *1968 Decree* and directed no other action than that set forth above.

Therefore, those portions of the *1968 Decree* not affected by *Utah* are not here reconsidered, and in so far as applicable, are incorporated in this Decree either by reference or by a summary or both.

## APPORTIONMENT OF GAS RESERVES

In accordance with the directives in *Utah,* we ordered submission by the parties of proposals or suggestions for an allocation of gas reserves that would meet the requirements of *Utah;* held evidentiary hearings thereon, and received briefs.

After considering the proposals, the evidence and the briefs, the Court on June 25, 1971, entered its Findings of Fact, Conclusions of Law and Opinion on the question of allocation of gas reserves, which were amended on July 26, 1971. These findings and opinion as amended is referred to herein as the June *1971 Decree*, and is incorporated in these findings and Decree by reference.

Thereafter, following the *Utah* directives, evidentiary hearings were had to again consider which applicant should acquire New Company; whether an award to a particular applicant will have any anti-competitive effects either in the California market or in other mar-

kets; and to again consider plans and proposals of divestiture which would provide for a "complete divestiture" as required by *Utah*.

At these hearings, the evidence received in the 1967–68 hearings, insofar as relevant to the questions presently before the Court, was made a part of the evidence to be considered together with additional evidence received at the current hearings.

Thereafter, briefs were filed and oral argument had. The Court's findings of fact and its determination of these questions follow.

WILL AN AWARD TO ANY PARTIC-
ULAR APPLICANT HAVE
ANTI-COMPETITIVE EFFECTS
IN THE CALIFORNIA MARKET
OR IN OTHER MARKETS?

■ From the evidence, we find that an award to any one of the applicants for acquisition will have no anti-competitive effects in the California market or in other markets.

The uncontroverted evidence is that since the 1967–68 hearings, a drastic change has occurred in the gas supplies and gas reserves of natural gas pipelines. In the 1967–68 hearings, neither the evidence nor the briefs of the parties indicated that a severe shortage of gas supplies and reserves was imminent. On the contrary, the evidence was to the effect and the parties generally took the position that an applicant with an efficient organization and expertize, by an application of time, effort, and money, could acquire the gas supplies needed to supply the needs of New Company and to enter into competition for the California market. In the 1967–68 hearings, emphasis was given to the question of how the successful applicant could enable New Company to compete with El Paso and others to serve the incremental demands of the California market.

Presently, neither El Paso nor any of the applicants for acquisition have gas supplies available to serve any part of the unsupplied demands of the California market.

The evidence is without dispute that the demand for pipeline gas exceeds the supply, and competition among suppliers to serve the incremental demands of the California market no longer exists. The present competition is among the markets for the available supplies, and among the pipelines for new reserves. This situation exists generally throughout the 48 contiguous states and among most, if not all of the interstate gas pipelines.

While intense competition exists among the interstate gas pipelines for new gas reserves and supplies to attempt to meet the demands of the market, the market demands continue to increase. The latest available studies by the FPC staff predict that the present gap between supply and demand continue to widen, with deficits of 9 TCF by 1980 and 17 TCF by 1990. (FPC Exhibit 1020).

The demand in California in 1975 is estimated to exceed present requirements by 2.2 billion cubic feet per day. (Tr. 71—1970 hearings.)

The plaintiff, nevertheless, asserts that the selection of Colorado Interstate Corporation (CIG) as the successful applicant will have anti-competitive effects in the California market. This contention requires consideration.

In the June *1968 Decree,* we dealt at some length with this question in the light of the facts then existing and concluded that CIG was not disqualified from consideration as the successful applicant. The reasons for this conclusion are set forth at pages 70–75 of the June *1968 Decree* which is made a part of the record in this case and will not be repeated here.

Presently, CIG finds itself in the same situation as other interstate gas pipelines. It is hard put to obtain new gas reserves sufficient to maintain an adequate deliverability life for its present market. Admittedly, it does not presently have sufficient gas supplies and reserves to mount a project to serve any part of the incremental demands of

the California market, even though, if it had the necessary gas supply, it would face no competition in serving that market.

Admittedly, the competition among natural gas pipelines for gas reserves and supplies is intense, and increasingly depends on the amount of capital that a pipeline can afford to risk with no assurance of return. CIG, although a company of substantial size, is only 28th in the national industry based on a comparison of gross revenues for the year 1969, with $86,454,000 of gross revenues. (CIG Exhibit 21). It is competing for gas reserves in the Rocky Mountain region with major pipelines much larger and more powerful than CIG.[2]

The Court concludes CIG has not been and is not now a potential competitor for the California market.

## SELECTION OF SUCCESSFUL APPLICANT

There are seven applicants for acquisition: Apco, Banister, CIG, Copaco, Husky, Paradox and Westco.

There is no consensus of opinion among the parties as to which applicant should be selected to acquire the property to be divested.

The plaintiff indicates its preference for Apco, Copaco, and Banister. The Federal Power Commission staff believes CIG to be the best qualified applicant, and the only applicant which has the capability at once to compete with El Paso and others for new gas reserves. Arizona approves Banister, CIG and Copaco. New Mexico approves all of the applicants except CIG and Paradox. The majority of the intervenors from the Pacific Northwest approve Banister and CIG with one approving Apco and three approving Husky.

Of the six California intervenors, five[3] would disqualify from consideration by the Court, all applicants except Apco, Copaco, and possibly Westco.[4]

■ The parties, including So Cal, recognize that any commitments to So Cal to sell it gas from the San Juan Basin are not binding or effective unless and until approved by the Federal Pow-

| 2. PIPELINE | GROSS REVENUE IN EXCESS OF |
|---|---|
| Tenneco | 471 Million |
| El Paso | 449 Million |
| Texas Eastern | 387 Million |
| Natural Gas Pipeline | 313 Million |
| Northern National | 320 Million |
| Panhandle Eastern | 246 Million |
| Texas Gas Transmission | 199 Million |
| (Tr. 4662–64–1970 Hearings) | |

3. California Attorney General, California PUC, Southern California Edison, Southern California Gas, San Diego Gas and Electric. (Pacific Gas and Electric did not join in the statement.)

4. The basis for this position was developed during the hearings on the allocation of gas reserves during which there was evidence that of the reserves proposed to be divested to New Company in the San Juan Basin, there "may be" 100,000 MCF per day, on an annual basis available to supply the unserved increments of demand in the California market.
Southern California Gas Company (So. Cal.) requested each applicant for acquisi-

tion to commit itself to sell this gas to So.Cal. at or near Ignacio, Colorado, and So.Cal. would arrange for its transportation to California through the El Paso Southern Division system.
Apco made a qualified acceptance to the extent of 40,000 MCF per day; Copaco committed itself only to file an application with the Federal Power Commission for a certificate to sell at least 40,000 MCF per day; and Westco made a commitment to sell 50,000 MCF per day.
The other applicants for acquisition did not refuse to consider So.Cal.'s offer, but refused to commit themselves at this stage of the proceedings. On this basis, the five California intervenors took the posi-

er Commission. It is the Federal Power Commission's area of responsibility to determine what portion, if any, of the San Juan reserves divested to New Company may be certificated to serve the California market. It would be improper for this Court either expressly or impliedly to invade the area of responsibility of the Federal Power Commission.

Additionally, it would be improper for this Court in this Decree, to attempt to dictate to the management of New Company, how and in what way it should attempt to enter the California market.

The Court, therefore, does not accept the conclusion of the five California intervenors that only Apco, Copaco, and perhaps Westco are qualified for consideration.

After careful consideration of all applicants, the Court has selected CIG as the successful applicant for reasons which we will set forth. However, we recognize that CIG is opposed by the plaintiff and some of the other parties and there is no assurance that the Supreme Court may not disapprove this Court's selection. In case of such disapproval, we see nothing to be gained by a remand of this matter to this Court for the selection of a different applicant. To avoid the delay incident to a remand, this Court selects Apco as its alternate and second choice, and the successful applicant should the Court's first choice be disapproved by the Supreme Court.

The reasons for the Court's selections follows.

For more than 40 years (since 1928) CIG has been engaged in the operation of a natural gas transmission system along the Eastern slope of the Rocky Mountains.

Since 1957, CIG has been engaged in the transmission and sale of natural gas under the Natural Gas Act. It has had a wealth of experience of operation of an interstate gas pipeline under the jurisdiction of the Federal Power Commission. Its principal markets are on the Eastern slope of the Rocky Mountains in Colorado, Southeast Wyoming, and in the Anadarko Basin, in Kansas and Texas. Its system consists of over 1900 miles of transmission and sales lateral lines and over 2,000 miles of gathering and storage systems lines. Its delivery capacity is in excess of 1 million MCF per day, its total deliveries in 1970 were 385 million MCF, with total gas sales revenues in excess of $87,000,000. It has a long-functioning organization, experienced management and personnel, is financially sound and well able to acquire and operate the divested properties and also financially able to finance a project to California if and when gas supplies are available for this purpose.

It has had many years of experience in seeking and obtaining gas reserves in the Rocky Mountain area. The acquisition of New Company by CIG should substantially enhance their collective financial capability to compete with the larger and more powerful pipelines for additional domestic reserves in that area and elsewhere.

Some apprehension has been expressed that a conflict of interest may arise between New Company and CIG in the use of additional gas supplies which may become available in the Rocky Mountain area and which could be economically delivered to either the New Company markets or CIG's markets. The major sources of supply of the two systems are widely separated by distance and terrain and it is highly improbable that any meaningful competition for gas supplies may arise between the two systems and particularly, in view of the fact that presently the best possibility for increased gas supplies for New Company is found in Canadian production.

██ Since the interstate transportation of gas is subject to regulation by the Federal Power Commission, the

tion "No applicant who has not made a definite, specific, and binding commitment to serve additional gas to California is qualified". (Page 2, Joint Statement filed April 3, 1972.)

Court is satisfied that if such a situation developed, the Federal Power Commission would have the authority to protect the interests of the consumers under both systems.

The Court concurs with the staff of the Federal Power Commission in its conclusion:

"In today's circumstances, then, forcing Colorado Interstate and the New Company to pursue new gas supplies alone weakens, not strengthens, competition for new gas supplies in San Juan, the Rocky Mountains, Texas, Oklahoma, Canada and Alaska. The benefits to competition which the Staff believes would occur as a result of combining the resources of the two companies far outweigh any anti-competitive effects which may result and would be augmented by the fact that the time lost in getting the New Company into the effort to get new gas would be minimized if Colorado Interstate is selected."

(Page 30 FPC Staff Brief filed April 5, 1972.)

The Apco group, through Alaska Interstate, has been engaged in the intrastate transmission and distribution of natural gas in the State of Alaska since 1967. Although the magnitude of its operations are small as compared to CIG, and although it has had no experience in the operation of an interstate pipeline under Federal Power Commission regulation, it is, in the Court's opinion, the applicant which should be selected to receive the divested assets in the event that the Supreme Court should disapprove this Court's selection of CIG.

## REIMBURSEMENT FOR DIVESTED ASSETS

### BASIS FOR REIMBURSEMENT

■ In the June *1968 Decree,* we determined that the basis for reimbursement to El Paso for the divested assets should be the fair market value of the divested assets determined by negotiations between the successful applicant and El Paso or if they are unable to agree, the fair market value as determined by the Court. This basis for reimbursement was not disapproved by the Supreme Court in *Utah* and it shall remain the basis for reimbursement in this Decree.

### DIVISION OF DEBT (ROLL OVER) [5]

The rate of interest which New Company will pay on its long term debt securities, which it will issue in part payment for the divested assets, is a matter of major importance not only to New Company, but also to New Company's customers and the gas consumers supplied by the New Company system, for reasons we here set forth.

The interest on El Paso's existing debt securities is lower than the interest which New Company will have to pay if it sells its debt securities on today's market. Since cost of debt is an element of New Company's rate base, a substantial increase in debt cost will be reflected by an increase in the rates paid by New Company's customers and ultimately the rates paid by the gas consumers.

If New Company can take over a portion of El Paso's debt, at or near the same interest cost which El Paso is now paying the benefits to New Company, its customers and gas consumers is apparent.

■ This objective can be accomplished by a division of El Paso's bond and debenture debt between New Company and El Paso and by New Company issuing to holders of El Paso bonds and debentures, New Company bonds and debentures of like tenor and effect, but with an interest rate $\frac{1}{8}$th of 1% greater than the rate applicable to the respective El Paso securities. In return, the El Paso bond and debenture holders upon receiving the New Company debt securities will surrender to El Paso for cancel-

5. "Roll Over of Debt" is the term used in the hearings. to describe a division of El Paso's debt between El Paso and New Company.

lation, an equivalent amount of El Paso bonds and debentures. El Paso and the bond holders committee which has intervened in this proceeding express confidence that the exchange of securities can be accomplished on this basis.

The alternative to this is a sale by New Company of its debt securities bearing interest at current rates.

The evidence discloses that El Paso embedded cost of debt is 6.2% which plus the ⅛th of 1% increase in interest resulting from the exchange for New Company debt securities would make New Company's debt cost 6.74%. The evidence establishes that if New Company were required to sell its debt securities at the market during the course of the recent hearings, the interest rate would have been not less than 8.5% and probably 9 to 9.5%.

The magnitude of this differential over a period of 20 years has been computed by the FPC staff to be over $38,000,000 if the interest is 8.5%; nearly $50,000,000 if the interest rate is 9%; and over $60,000,000 if the interest rate is 9.5%. (See FPC Exhibits 1014, 1014a, and 1014b.)

To avoid adverse effects of an increased debt cost, we provided in the June 1968 Decree at Page 78:

"New Company will assume approximately $170,000,000 of El Paso's bond and debenture debt and assume the payment of the cost of the debt roll over of ⅛th of 1% increase in the interest rate."

The Supreme Court in Utah disapproved, stating:

"Assumption of $170,000,000 of El Paso's indebtedness helps keep the two companies in league."

It was never intended that New Company would "assume" El Paso's debt in that sense. We intended and do now decree that the debt be divided and completely severed and that New Company

issue its own obligations for its share of the debt. New Company shall not be obligated to pay any part of El Paso's share of the debt and El Paso shall not be obligated to pay any part of New Company's share of the debt. El Paso shall have no lien on New Company's property and New Company shall have none on El Paso's.

By this Decree, there will be a complete severance of all managerial and financial connections between El Paso and New Company with respect to the debt apportioned to each.

This Court has considered the fact that after the debt division, New Company and El Paso will have common bond holders and concludes that that fact is not violative of the Utah decision. It is established by the evidence that in pipeline financing, substantially the same financial institutions provide large portions of the debt capital of all major pipelines. The net result will be the same if New Company sells the debt securities on the open market. Its debt securities would undoubtedly be purchased at least in part by institutional investors who hold bonds and debentures of other natural gas pipelines, including El Paso.

The evidence also establishes that in no instance, known to the witnesses who testified in this respect, has any institutional bond holder attempted to control or dictate the policy of the companies whose bonds they hold.

The parties are in agreement that such a debt division is in accord with the "cash sale" requirements of the Utah opinion. The Court agrees. Using a dictionary [6] definition of cash sale as "money or its equivalent", upon completion of the purchase of the divested property by New Company, El Paso will promptly receive its bonds and debentures in the amount of New Company's share of the debt. The receipt by El Paso of its bonds and debentures is, in the Court's opinion, the receipt by El

6. Webster's Third New International Dictionary Unabridged and Black's Law Dictionary Fourth Edition.

Paso of the equivalent of money in the same amount.

During the 1967–68 hearings, the cost of the debt division amounting to an increase of ⅛th of 1% in the interest rate, was generally accepted as a reasonable cost to be borne by New Company to obtain the advantage of El Paso's lower interest cost. Plaintiff registered no objection. In the recent hearings, the plaintiff has urged the Court to order El Paso's bond holders to accept New Company debt securities at no increase in interest rate in exchange for presently held El Paso debt securities.

Some intervenors in the Northwest would have the Southern division share in the payment of the ⅛th of 1%, but no evidence was presented by them upon which the Court could base a plan to put the proposal into effect.

We are of the opinion that the payment by New Company of ⅛th of 1% in increased interest is justified by the benefits that New Company will receive.

Since all bond and debenture holders are not parties, a serious consideration of the above proposals would require the joinder of all bond holders affected and additional hearings with the delays incident thereto. The proposals and suggestions are not accepted.

We adopt as an integral part of the plans for divestiture, later discussed, a division of El Paso's debt between El Paso and New Company, in the manner set forth above.

The amount of New Company's share of the debt shall be approximately equal to the tax basis of the properties to be divested—the exact amount shall be a matter of negotiation between the successful applicant and El Paso and subject to this Court's approval.

## REIMBURSEMENT FOR EQUITY

Several plans for reimbursement have been proposed by the parties and the applicants for acquisition. All are premised on a division of debt—and a reimbursement for the equity in various ways.

There are four plans which merit consideration: a plan proposed by El Paso (El Paso Plan); a plan proposed by Apco (Apco Plan A); a plan proposed by Copaco (Copaco Plan), and a plan proposed by Paradox and Banister as modified by the Court which for convenience we refer to as the Modified Paradox Plan.

In the Court's opinion, all four of these plans fulfill the requirements of Utah that:

"The severance of all managerial and all financial connections between El Paso and the New Company must be complete for the decree to satisfy our mandate. Only a cash sale will satisfy the rudiments of complete divestiture."

Most of the parties and applicants for acquisition believe these plans are in harmony with Utah. Some have not commented. Oregon and Edison express doubts that the El Paso Plan will qualify under the Utah requirements and Paradox asserts that its plan is the only one which will satisfy the Utah requirements.

There is no assurance that the plan preferred and adopted by this Court will receive the approval of the Supreme Court. In the event that it does not, we can conceive of no reason for further hearings or further delay in the disposition of this litigation. A full and complete record has been made and the Supreme Court will have before it all proposed plans, together with the evidence and arguments pro and con. If the Supreme Court disapproves the plan adopted by this Court, it can determine which plan should be adopted and this Court can then proceed to implement that plan without further delay.

This Court will, therefore, adopt the plan which it prefers as the plan for divestiture and express its order of preference for the others.

This Court prefers the El Paso Plan with modifications; its second preference is for the Apco Plan A; its third preference is for the Copaco Plan;

and its fourth preference is for the Modified Paradox Plan.

## EL PASO PLAN

The El Paso Plan incorporates the debt division adopted by the Court. This plan, as modified by the Court, is as follows: El Paso will transfer the divested assets to New Company and New Company will pay El Paso for the equity therein by issuing to El Paso all of the common stock of New Company. El Paso will sell to the successful applicant, 20% of the common stock of New Company, at a price to be negotiated by El Paso and the successful applicant, or if parties cannot agree, at a price to be fixed by the Court.

Concurrently, the remainder of the stock will be placed in a voting trust to be administered solely by the successful applicant. Participation certificates in the voting trust will be distributed pro rata to the holders of El Paso's common stock. The voting trust agreement will provide that a holder may surrender his participation certificates for the appropriate number of shares of New Company subject to restrictions designed to prevent El Paso stockholders from acquiring any shares of New Company stock and prevent El Paso's officers, directors, and members of their families from holding New Company stock.[7]

To the extent that participation certificates have not been surrendered at the end of five years, the remaining shares held in the voting trust shall be sold and the proceeds distributed to the holders of the remaining participation certificates.

Six of the seven applicants for acquisition find this plan acceptable, with four of the six choosing the plan as their first choice.

The Court finds that this plan will accomplish a severance of all managerial and financial connections between El Paso and New Company; a complete dissolution of the intercorporate community of interest between El Paso and New Company; and satisfy the "cash sale" requirements of *Utah*.

The plaintiff and the Federal Power Commission staff agree,[8] as do all intervenors who have commented except Oregon and Edison.

This plan is preferred by the Court because it is capable of immediate implementation and will accomplish a complete divestiture with a minimum of delay; it will assure, through the medium of the voting trust, control of New Company management by the successful applicant for a five-year period; it will produce a wide distribution of the New Company common stock and will prevent the concentration of New Company common stock into the hands of El Paso's stockholders or its officers and directors or their families; the execution of the plan is not dependent on public stock offerings or stockholder consents, with the delays and uncertainties inherent in such offerings; it provides a simplified capital structure and a good cash flow; and it will have no adverse effect on the gas rates in the Northwest or the Southern division.

## APCO PLAN A

This plan contemplates a sale of 100% of the equity ownership in New Company and the elimination of the necessity for a voting trust. It also incorporates the debt division established by this Court.

Apco states that under this plan, El Paso would transfer to New Company, the assets determined by the Court to be divested and would receive from New

---

7. The restrictive provisions will be negotiated between El Paso and the successful applicant subject to the approval of the Court. These restrictive provisions will be no less restrictive than those adopted by the Court as a part of the *1968 Decree*.

8. Plaintiff's tentative plan of divestiture filed January 12, 1971, Pages 22–24 and Federal Power Commission staff brief filed April 5, 1972, Pages 6 and 7.

Company in exchange therefor, the following stocks: New Company cumulative, preferred stock with par value of $30 million having a dividend rate of 5½%; New Company Class A common stock with stated value of $30 million; and New Company Class B common stock issued for the balance of El Paso's equity in New Company. Prior to the payment of any dividends on Class B common stock, the Class A common stock would be entitled to 6% of the stated value. Class B common stock would then receive dividends of 6%, if earned. Thereafter, the Class A common stock would receive an additional dividend up to 4% of its stated value, if earned, before any additional dividend would be paid on the Class B common stock. Both Class A and Class B common stock would have voting rights, but the Class B common would be structured so that it would have in excess of 50% of the outstanding voting rights in order to maintain control of New Company. The 5½% cumulative preferred stock would have substantially the same priorities and limitations as the presently outstanding El Paso issue of $60 million par value 5⅛% cumulative preferred stock, series of 1965.

El Paso would then make the following distribution of all such stock; the New Company preferred stock and the New Company Class A common stock would be tendered to the holders of El Paso's $60 million 5⅛% preferred series in exchange therefor, pursuant to prearranged agreements.[9]

All shares of New Company Class B common stock would be tendered to and exchanged with the successful applicant for an amount of El Paso common stock equivalent to the difference between $60 million and the total value of the El Paso equity as fixed by the Court or determined by negotiation.

Adequate operating funds would be provided by the applicant purchasing Class B common stock from New Company at the same time that El Paso transfers the assets to be divested.

Although this plan was devised by Apco for its use, the essence of the plan could be implemented by CIG.

This plan accomplishes a complete divestiture without the necessity of a voting trust, and without adversely affecting the gas rates to New Company customers. The El Paso Plan is simpler and faster to implement and results in a simpler equity structure because the equity is represented entirely by common stock while Apco Plan A contemplates $30 million of preferred stock and two types of common stock. The El Paso Plan results in a better cash flow because of a sinking fund requirement that probably would be required in connection with the preferred stock issued under the Apco Plan A.

### COPACO PLAN

This plan also contemplates the debt division as established by this Court.

The Copaco Plan involves the following steps:

(1) El Paso will transfer to New Company all assets to be divested in exchange for New Company stock and the issuance by New Company of debt securities. For its contribution to New Company, El Paso will receive not less than 80% of the equity securities.

The securities issued by New Company will be of a class, tenor, and effect to provide New Company a capitalization and cost of debt as favorable as that enjoyed by El Paso prior to the divestiture. Copaco has proposed the inclusion of preferred stock in the capitalization of New Company (just as preferred stock is included in the capitalization of El Paso) in order to accomplish this desirable result.

Concurrently with the transfer by El Paso to New Company of all the assets

---

9. Apco states that this stock was privately placed and is held by a small number of institutional investors. A survey of a majority of these holders has confirmed the opinion that there would be no difficulty in effecting such exchange.

to be divested, the Copaco Group will transfer to New Company, $12,600,000 worth of assets comprised of cash and common stock of other corporations in exchange for stock of New Company. The value of such common stock of other corporations is not expected to exceed $1,500,000. This portion of the plan is designed to fit Copaco's particular situation, but could be varied by negotiation of the amount of the transfer by the successful applicant to New Company.

The proportion of New Company common stock received by the Copaco Group and El Paso will be determined by the relative value of the contributions made by each to New Company.

(2) The debt securities issued by New Company will be disposed of on Court-approved terms and conditions.

(3) The stock of New Company issued to El Paso will also be disposed of by El Paso under the Court-approved terms. Copaco suggests that the disposition of the equity securities be accomplished by permitting El Paso to make and publish an offer to accept tenders from those El Paso stockholders who will surrender their entire holding of El Paso stock for redemption by El Paso in exchange for shares of stock of New Company.

Under Copaco's suggested tender offer, El Paso will accept tenders from its stockholders to exchange all their El Paso stock for New Company stock. El Paso would make the exchange offer attractive enough so that at least 80% of the New Company stock would be exchanged. If the tender offer is oversubscribed, the New Company shares will be delivered to those interested El Paso shareholders on a first-come first-served basis.

The Court prefers Apco Plan A over the Copaco Plan because the tender offer to El Paso stockholders who will surrender their entire holdings of El Paso stock for redemption by El Paso in exchange for shares of stock of New Com-

pany, may create problems resulting from undersubscription or oversubscription of the tender offer. Also, if El Paso and Copaco cannot agree on a value of New Company stock for the purposes of exchange, a determination by the Court of the fair market value of the equity may be required. Such a determination might well require additional hearings with attendant delays.

The implementation of the Copaco Plan would be more complicated and would take more time than would the implementation of the El Paso Plan.

### MODIFIED PARADOX PLAN [10]

This plan incorporates the debt division heretofore established by the Court and provides that El Paso will transfer the divested assets to New Company. New Company will pay El Paso, in money, the fair market value of the equity from funds obtained in whole or in part from a public sale of equity securities of New Company or its parent, if New Company should be a subsidiary.

This plan fulfills the requirements of *Utah.* It provides for the payment, in money, for the entire value of the equity. The money is to be obtained from the proceeds of a public offering of the common stock of New Company or its parent if New Company is a subsidiary and is attended with the delays and uncertainties incident thereto. The public sale has no restrictive provisions prohibiting the acquisition of the stock by El Paso or its officers and directors. Since the stock is publicly held, the management of New Company is subject to control by any group which acquires working control of the stock of New Company or its parent. We believe the El Paso Plan more adequately assures control of New Company management by the successful applicant.

In selecting the El Paso Plan and in determining the order of its preference for the others, this Court has omitted any reference to the tax consequences of

10. Paradox and Banister proposed "book value" of the divested assets as the basis

for reimbursement rather than "fair market value" adopted by the Court.

any plan. This omission is pursuant to the statement in the *Utah* decision:

". . . the pinch on private interests is not relevant to fashioning an antitrust decree, as the public interest is our sole concern."

Nevertheless, several of the intervenors who are customers of El Paso's southern division have urged this Court not only to consider the possible tax consequences, but also to include in its decree, provisions to insulate El Paso's southern division customers from any adverse effects of those taxes.[11]

This request deserves comment. Under the plan adopted by this Court, no adverse tax effects of the kind feared by the intervenors are anticipated, and no action on the request is necessary at this time.

Should the plan adopted by this Court be disapproved by the Supreme Court and a plan is designated by it which will have adverse tax consequences on El Paso, we assume the Supreme Court will indicate to what extent, if any, the request of these intervenors may be considered in the implementation of the plan approved by the Supreme Court.

## DECREE OF DIVESTITURE

As we have previously pointed out, the *1968 Decree,* which dealt with many matters and details necessary to the accomplishment of a divestiture, was remanded only for a reconsideration of the apportionment of gas reserves; a reconsideration of which applicant should acquire New Company; and a reconsideration of the method of reimbursement of El Paso by New Company for the divested assets.

Consequently, those portions of the *1968 Decree* not affected by *Utah* are not reconsidered and insofar as applicable, are incorporated in this decree.

For convenience of all concerned, we set forth in this Decree, the disposition of those assets which are referred to in the *1968 Decree* and those assets since acquired and which should be divested.

## PHYSICAL ASSETS

The property, plant, and equipment, described in El Paso Exhibits 18 and 22, together with any additions, modifications, or replacements thereof, subsequent to August 4, 1967, shall be divested to New Company.

## GAS SALES AGREEMENTS

All gas sales contracts and agreements with any customer connected to any of the facilities to be divested existing at the effective date of the divestment, shall be divested to New Company.

## GAS RESERVES

El Paso shall divest to New Company gas reserves as set forth in the June *1971- Decree* of this Court as amended which is hereby incorporated into and is declared to be a part of this Decree.[12]

El Paso has secured a commitment from Westcoast Transmission Company Limited whereby Westcoast has agreed to offer to New Company the first right to purchase the next 400 million cubic feet per day of gas which becomes available to its system. Since this commitment is to New Company, no order of divestiture is required.

---

11. Under the modified Paradox Plan, El Paso would incur Federal taxes estimated from a minimum of $30 million to a maximum of $77 million. (El Paso Exhibit 197) Arizona, PG & E, San Diego Gas and Electric, and Edison believe that taxes of this magnitude would affect El Paso's ability to meet its existing contractual commitments to the southern division; reduce funds for exploration for new reserves to serve the southern division, and might result in an adverse impact on the rate base and rates to the southern division customer. Arizona brief filed April 3, 1972—Pages 8–13 and 18–19; PG & E brief filed April 3, 1972 —Pages 11–12; San Diego Gas and Electric brief filed April 3, 1972—Pages 7–9; Edison brief filed March 31, 1972 —Pages 16–18.

12. See Pages 26–44 of the *1968 Decree* for the allocation then made.

Although this commitment cannot be classified as a proven gas reserve, it may be considered as an unproven but potential source of gas supply.

## WEST COAST AND NORTHWEST PRODUCTION COMPANY STOCK

For reasons set forth in the *1968 Decree,* (Pages 48 and 49) El Paso shall divest itself of the West Coast and Northwest Production Company stock either to New Company, or if the successful applicant does not need or does not want the stock, or the funds derived from its sale, then divestment shall be made by sale to persons satisfactory to the Court and the sale accomplished as soon as practical after final certification of New Company by the Federal Power Commission. (See Pages 8–11 and 13–14 of Appendix to *1968 Decree* for details of the stock and its acquisition.)

## TAX LOSS CARRY FORWARD

For the reasons set forth on Pages 50 to 53 of the *1968 Decree,* remuneration by El Paso to New Company for the use of this item is not required.

## MOBIL NOTES

For the reasons set forth at Pages 53 and 54 of the *1968 Decree,* the Mobil contract and notes should be divested to New Company and New Company should assume the obligations of the contract remaining at the time divestiture is made.

## INVESTMENTS

The following investments may be divested to New Company or retained by El Paso, as El Paso and the successful applicant shall agree. (See Pages 12–15 of Appendix to *1968 Decree* for details.)

1. 49 percent of the capital stock of Phillips Pacific Chemical Co., which owns a fertilizer plant near Hedges, Washington;
2. All of the capital stock of Pacific Northwest Realty Corporation which owns an office building in Salt Lake City, Utah;
3. Inactive subsidiaries acquired from Pacific Northwest as a result of the merger:

   Prarie Pipeline Ltd.

   Prarie Transmission Lines, Ltd. Specialty Gas Products

   The total investment in these companies is $61,000.
4. Miscellaneous ·club memberships representing an investment of $7,000.
5. Belco Petroleum Cor. Notes.

## INTERCOMPANY AND MISCELLANEOUS CONTRACTS

### *Sumas Exchange Agreement*

This . agreement was terminated on June 30, 1969, pursuant to the *1968 Decree.* (Page 55 of *1968 Decree.*)

## COLORADO INTERSTATE, PACIFIC NORTHWEST AND EL PASO CONTRACT

This contract has been completed and there is nothing to divest.

## 100–100–100–60–40 CONTRACT

This contract is described at Page 58 of the *1968 Decree.* It has been inoperative since the 1957 merger and the Court finds no reason to reactivate the agreement.

## KINGSGATE EXCHANGE

This agreement is described at · Page 59 of the *1968 Decree.* The agreement was never consummated and there is no reason for New Company to enter into such an agreement at this time.

## SAN JUAN GATHERING AGREEMENT

Prior to the merger, PNW and El Paso had entered into a mutual gas gathering in the San Juan Basin under a contract which is in evidence as El Paso Exhibit 4. That contract covered only 126 wells producing gas from one formation in a limited area.

Whether or not New Company and El Paso should enter into a mutual gas gathering agreement is a matter for negotiation by the parties, subject to scrutiny and approval or disapproval by the Federal Power Commission.

## JACKSON PRARIE FIELD STORAGE PROJECT

El Paso has a one-third interest in this project which it proposes to divest to New Company. For the reasons stated at Pages 60 and 71 of the *1968 Decree,* El Paso shall divest its interest in this project to New Company.

## MISCELLANEOUS

El Paso has offered to transfer to New Company its interest in the project now underway in which Mountain Pacific Pipeline Ltd is attempting to acquire gas reserves in the Laird/Fort Simpson and MacKenzie River Delta regions of Canada as well as the North Slope of Alaska and the Artic Islands. Production from these reserves would be transported to the U.S./Canadian border by Mountain Pacific from where it can be moved to California by Pacific States Pipeline Company, a corporation formed jointly by Pacific Lighting Service Company, Southern California Edison Company and El Paso on behalf of New Company. El Paso will also commit to New Company, the right of first refusal to any production of natural gas by El Can Petroleum Company, a company recently formed by El Paso for the purpose of conducting exploration activities for gas in the provinces of Alberta, Saskatchewan, and British Columbia, Canada.

The acceptance or rejection of these offers is a matter for determination by the successful applicant and are not matters for the approval or disapproval of this Court.

## TIME OF DIVESTMENT

Final divestment shall be consummated as soon as possible after the issuance of a permanent certificate to New Company by the Federal Power Commission. In the interim period, New Company may assume control and management of the physical plant if so authorized by a temporary certificate issued by the Federal Power Commission.

The successful applicant shall divest itself of any El Paso stock it may own or control prior to assuming control and management of the property.

## OPERATING EMPLOYEES IN THE NORTHWEST DIVISION

Those employees of El Paso who are employed in the operations of the northwest division at the time of divestment and who desire to continue their employment with the New Company should, generally speaking, be offered employment by New Company on no less favorable terms and with no less favorable benefits than their present employment provides. This is a statement of principle, and is not intended to vest in any individual employee a right to be employed by New Company. This statement of principle does not apply to those employees holding policy-making positions.

## FINAL JUDGMENT AND TIME FOR APPEAL

This Decree, with any modifications or amendments hereafter adopted, shall be a final judgment and subject to appeal.

If an appeal is taken, upon remand of this action to this Court by the Supreme Court, this Court will take whatever action may be necessary or proper to implement the plan of divestiture approved by the Supreme Court.

Should there be no appeal, this Court, upon the expiration of the time for appeal, will take appropriate action to implement the plan adopted by this Court in this Decree.

The parties and the applicants for acquisition may, within fifteen days from this date, file objections to or requests for modifications of or amendments to this Decree, if they so desire, but filing

of such objections and requests shall not be a condition precedent to the right of appeal.

The time for appeal shall run from the date of this Court's Order disposing of any objections to or requests for the modification of or amendments to this Decree, or if no such objections or requests are filed, the time for appeal shall run from the expiration of the fifteen-day period allowed for the filing of such objections or requests.

## ON MOTION TO REINSTATE DECREE

■ On June 16, 1972, we entered a divestiture decree which became final on July 10, 1972. The Decree provides in part:

"After careful consideration of all applicants, the Court has selected CIG as the successful applicant for reasons which we will set forth. However, we recognize that CIG is opposed by the plaintiff and some of the other parties and there is no assurance that the Supreme Court may not disapprove this Court's selection. In case of such disapproval, we see nothing to be gained by a remand of this matter to this Court for the selection of a different applicant. To avoid the delay incident to a remand, this Court selects APCO as its alternate and second choice, and the successful applicant should the Court's first choice be disapproved by the Supreme Court."

On July 12, 1972, CIG filed a motion to join Coastal States Crude Gathering Company and Coastal States Gas Producing Company (Coastal States) as parties to this action, alleging that Coastal States was seeking to obtain control of CIG by a tender offer to purchase up to 2,250,000 shares of common stock of CIG.

On July 18, 1972, we entered the following order:

"It has come to the Court's attention that Coastal States Crude Gathering Company, a wholly-owned subsidiary of Coastal States Gas Producing Company, by a tender offer to purchase stock of Colorado Interstate Corporation, is seeking to obtain control of or power to control the management of Colorado Interstate Corporation, which corporation this Court has selected as the successful applicant to acquire the assets to be divested in this proceeding. If Coastal States is successful, in the Court's opinion, a reconsideration of the selection of the successful applicant and related provisions of the Decree of June 16, 1972, may be required.

"IT IS THEREFORE ORDERED that the Court's Decree of June 16, 1972, is hereby stayed until the further order of this Court.

"IT IS FURTHER ORDERED that the time for appeal from the June 16, 1972, Decree shall not run during the period of this stay."

Upon being advised that Coastal States was acquiring through the tender offer 2,040,000 shares, approximately 48%, of the common stock of CIG, we entered a further order on August 2, 1972, which in pertinent parts states:

"The Court is now advised that Coastal States is acquiring 2,040,000 shares of the common stock of Colorado Interstate, pursuant to the tender offer.

"The Court is of the opinion that there should be a reconsideration of the selection of Colorado Interstate as the successful applicant and related provisions of the Decree of June 16, 1972, and that the parties to this proceeding should have an opportunity to be heard with respect thereto.

"IT IS THEREFORE ORDERED that any party desiring to be heard with respect to such consideration shall file with the Court on or before the 18th day of August, 1972, a written statement of such party's proposals, positions, or suggestions, and serve a copy thereof upon the parties to this proceeding.

"IT IS FURTHER ORDERED that on the 28th day of August, 1972, at 9:00 A. M., the Court will sit to hear oral

argument with respect thereto. Oral argument shall be limited to those parties filing written statements.

"IT IS FURTHER ORDERED that the time for appeal from the June 16, 1972, Decree, shall not run until the further order of the Court."

In response to this order, CIG filed a motion requesting the Court to reinstate the June 16, 1972, Decree or in the alternative, to reopen the record "for the limited purpose of the taking of evidence relevant to such issues pertinent herein as may have arisen as a result of Coastal States' acquisition of a substantrial portion of CIG's common stock." Other parties responded to the Court's Order of August 2, 1972, with various suggestions and proposals. Some parties supported and others opposed the reopening of the proceedings to take evidence upon what effect the acquisition of control of CIG by Coastal States would or should have upon the selection of CIG as the successful applicant.

Oral argument was had on August 28, 1972, and the matter is now before us for decision.

The acquisition of control of CIG by Coastal States through the acquisition of approximately 48% of the common stock of CIG cannot and should not be ignored.

CIG controlled by Coastal States certainly is not the same applicant which was before the Court at the time of the hearings which was the basis for the June 16, 1972, Decree. At that time, the largest single holding of CIG voting securities (except holdings by nominees for mutual funds, trust accounts, and brokerage houses) did not exceed 1% and the largest holding by any nominee or brokerage house was less than four percent.

If Coastal States had held the controlling interest in CIG at the time of our hearings to select a successful applicant, it would have been subjected to close scrutiny as to the impact its control would have upon CIG's management and financial policies and the many other matters pertinent to the selection of the best qualified applicant, including the anti-competitive effects either in the California market or in other markets of Coastal's control of CIG.

Certainly we cannot now certify to the Supreme Court that CIG, controlled by Coastal States, is the best qualified applicant and that there are no anti-competitive effects resulting from the selection of CIG.

We conclude that there are only two alternatives to be considered: a summary disqualification of CIG as the successful applicant, or a reopening of the proceedings to consider anew the application of CIG in the light of its control by Coastal States.

To reopen the proceedings for this purpose would result in substantial delay in the conclusion of this litigation and the accomplishment of a divestiture. Without the delay incident to a reopening of the proceedings for this purpose, we still face the delay involved in the review of this Court's Decree by the United States Supreme Court, the delay incident to the proceedings that may be necessary as a result of the Supreme Court's review and the delay incident to the proceedings by the successful applicant before the Federal Power Commission for a certificate to operate the divested property.

Further delay in the entry of a final decree is not justified.

Without reopening the proceedings for further evidence and inquiry, CIG, because of Coastal States' power to control it, should not be permitted to acquire the property to be divested.

We selected APCO as the second best qualified applicant for acquisition and APCO should now be selected as the successful applicant to acquire the properties to be divested.

It is therefore ordered that the Decree of June 16, 1972, is amended and modified as follows:

1. The selection of CIG as the successful applicant is hereby revoked;

2. APCO is hereby selected as the successful applicant;

3. Except to the extent modified and amended by Paragraphs 1 and 2 above, the Decree of June 16, 1972, as modified by the Court's Order of July 10, 1972, shall remain in full force and effect;

4. All motions, suggestions, and proposals of the parties other than those adopted in Paragraphs 1 and 2 above are overruled and denied;

5. The time for appeal from the Decree of June 16, 1972, as modified shall begin to run from this date.