# UNITED STATES *v.* EL PASO NATURAL GAS CO. ET AL.

No. 94.   Argued February 25–26, 1964.—Decided April 6, 1964.

*Solicitor General Cox* argued the cause for the United States. With him on the brief were *Robert L. Wright, Frank Goodman* and *Robert B. Hummel.*

*Gregory A. Harrison* argued the cause for appellees. With him on the brief were *Arthur H. Dean, Charles V. Shannon, Atherton Phleger, Roy H. Steyer, Leon M. Payne* and *Dennis McCarthy.*

*William M. Bennett* filed a brief for the State of California, as *amicus curiae,* urging reversal.

Opinion of the Court by Mr. Justice Douglas, announced by Mr. Justice Clark.

This is a civil suit charging a violation of § 7 of the Clayton Act,[1] by reason of the acquisition of the stock and assets of Pacific Northwest Pipeline Corp. (Pacific Northwest) by El Paso Natural Gas Co. (El Paso). The District Court dismissed the complaint after trial, making findings of fact and conclusions of law, but not writing an opinion. The case is here on direct appeal. 15 U. S. C. § 29. We noted probable jurisdiction, 373 U. S. 930.

The ultimate issue revolves around the question whether the acquisition substantially lessened competition in the sale of natural gas in California—a market of which El Paso was the sole out-of-state supplier at the time of the acquisition.[2]

---

[1] Section 7 of the Clayton Act, 38 Stat. 731, as amended in 1950 by the Celler-Kefauver Anti-Merger Act, 64 Stat. 1125, 15 U. S. C. § 18, provides in relevant part: "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition *may be substantially to lessen competition,* or to tend to create a monopoly." (Italics added.)

[2] In 1956, El Paso supplied more than 50% of all gas consumed in the State, the remainder coming from intrastate sources.

In 1954, Pacific Northwest received the approval of the Federal Power Commission to construct and operate a pipeline from the San Juan Basin, New Mexico, to the State of Washington, to supply gas to the then unserved Pacific Northwest area. Later it was authorized to receive large quantities of Canadian gas and to enlarge its system for that purpose. In addition, Pacific Northwest acquired Rocky Mountain reservoirs along its route. At the end of 1957 it had an estimated 3.51 trillion cubic feet of gas reserves owned outright in the San Juan Basin; 1.04 trillion under contract in the San Juan Basin; 1.59 trillion-under contract in the Rocky Mountain area; and 2.33 trillion under contract in Canada—8.47 trillion in all. By 1958 one-half of its natural gas sales were of gas from Canada.

In 1954 Pacific Northwest entered into two gas exchange contracts with El Paso—one to deliver 250 million cubic feet per day to El Paso in Idaho for transportation to California via Nevada, the other to gather gas jointly in the San Juan Basin for a five-year period. Under the latter agreement El Paso loaned gas to Pacific Northwest from its wells in the San Juan Basin; to avoid duplication of facilities, Pacific Northwest agreed to gather gas with its own facilities from El Paso's wells in the eastern portion of the basin, and El Paso agreed to perform the same service for Pacific Northwest in the western portion. At the same time Pacific Northwest undertook to purchase 300 million cubic feet per day from Westcoast Transmission Co., Ltd., a Canadian pipeline.

An executive of Pacific Northwest called these agreements a "treaty" to "solve the major problems which have been confronting us." A letter from Pacific Northwest to its stockholders stated:

> "This tri-party deal will benefit all concerned. It will give Westcoast what they have been fighting for—a pipeline. It will mean that Pacific will ex-

pand its facilities, be a larger company, will protect its market from future competition by a Canadian pipeline and it caused the dismissal of the law suit of Westcoast against Pacific's present certificate. *It means that El Paso's California market will be protected against future competition,* and further it results in all parties *now working together for a common end rather than fighting each other."* (Italics added.)

El Paso, however, could not get Commission approval to build the pipeline necessary to deliver the 250 million cubic feet of gas to California. Consequently, a new agreement on that aspect was negotiated in 1955, whereby El Paso undertook to purchase 50 million cubic feet a day to be delivered on an exchange basis in Colorado. Pacific Northwest, still obligated to take 300 million cubic feet per day from Westcoast, disposed of the balance in its own market areas.

Prior to these 1954 and 1955 agreements Pacific Northwest had tried to enter the rapidly expanding California market. It prepared plans regarding the transportation of Canadian gas to California, where it was to be distributed by Pacific Gas & Electric (PGE). That effort—suspended when the 1954 agreements were made—was renewed when the new agreement with El Paso was made in 1955; and the negotiation of the 1955 contract with El Paso was conceived by Pacific Northwest as the occasion for "lifting of all restrictions on the growth of Pacific." In 1956 it indeed engaged in negotiations for the sale of natural gas to Southern California Edison Co. (Edison). The latter, largest industrial user of natural gas in Southern California, used El Paso gas, purchased through a distributor. It had, however, a low priority from that distributor, being on an "interruptible" basis, *i. e.,* subject to interruption during periods of peak demand for domestic uses. Edison wanted a firm con-

tract and, upon being advised that it was El Paso's policy to sell only to distributors, started negotiations with Pacific Northwest in May 1956. The idea was for Pacific Northwest to deliver to Edison at a point on the California-Oregon border 300 million cubic feet of Canadian gas a day. In July 1956 they reached a tentative agreement. Edison thereupon tried to develop within California an integrated system for distributing Canadian gas supplied by Pacific Northwest to itself and others. El Paso decided to fight the plan to the last ditch, and succeeded in getting (through a distributor) a contract for Edison's needs. Edison's tentative agreement with Pacific Northwest was terminated. Before Edison terminated that agreement with Pacific Northwest, Edison had reached an agreement with El Paso for firm deliveries of gas; and while the original El Paso offer was 40¢ per Mcf, the price dropped to 38¢ per Mcf, then to 34¢ and finally to 30¢. Thereafter, and while the merger negotiations were pending, Pacific Northwest renewed its efforts to get its gas into California.

El Paso had been interested in acquiring Pacific Northwest since 1954. The first offer from El Paso was in December 1955—an offer Pacific Northwest rejected. Negotiations were resumed by El Paso in the summer of 1956, while Pacific Northwest was trying to obtain a California outlet. The exchange of El Paso shares for Pacific shares was accepted by Pacific Northwest's directors in November 1956, and by May 1957 El Paso had acquired 99.8% of Pacific Northwest's outstanding stock. In July 1957 the Department of Justice filed its suit charging that the acquisition violated § 7 of the Clayton Act. In August 1957 El Paso applied to the Federal Power Commission for permission to acquire the assets of Pacific Northwest. On December 23, 1959, the Commission approved and the merger was effected on December 31, 1959. In 1962 we set aside the Commission's order, holding that

it should not have acted until the District Court had passed on the Clayton Act issues. *California* v. *Federal Power Comm'n,* 369 U. S. 482. Meanwhile (in October 1960) the United States amended its complaint so as to include the asset acquisition in the charged violation of the Clayton Act.

There was a trial, and after oral argument the judge announced from the bench [3] that judgment would be for appellees and that he would not write an opinion. He told counsel for appellees "Prepare the findings and conclusions and judgment." They obeyed, submitting 130 findings of fact and one conclusion of law, all of which, we are advised, the District Court adopted verbatim. Those findings, though not the product of the workings of the district judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence. *United States* v. *Crescent Amusement Co.,* 323 U. S. 173, 184–185. Those drawn with the insight of a disinterested mind are, however, more helpful to the appellate court. [4] See 2B Barron

---

[3] "The Court. Judgment will be for the defendant in this case. Prepare the findings and conclusions and judgment.

"How much time do you want within which to submit it?

"Mr. Harrison. Does the court have a rule, your Honor?

"The Court. No, I have no rule about that.

"Mr. Harrison. Could we have twenty days, your Honor?

"The Court. Twenty days to prepare the findings and conclusions and judgment. I shan't write an opinion in this case.

"Mr. Harrison. I didn't hear you.

"The Court. I don't intend to write an opinion in this case. I think it is a factual matter. I think we have taken a full, fair look at the evidence and the factual issues, and I am not satisfied that the Government has discharged its burden."

[4] Judge J. Skelly Wright of the Court of Appeals for the District of Columbia recently said:

"Who shall prepare the findings? Rule 52 says the court shall prepare the findings. 'The court shall find the facts specially and

and Holtzoff, Federal Practice and Procedure (Wright ed. 1961), § 1124. Moreover, these detailed findings were "mechanically adopted," to use the phrase of the late Judge Frank in *United States* v. *Forness,* 125 F. 2d 928, 942, and do not reveal the discerning line for decision of the basic issue in the case. On review of the record—which is composed largely of undisputed evidence—we conclude that "the effect of such acquisition may be substantially to lessen competition" within the meaning of § 7 of the Clayton Act.

There can be no doubt that the production, transportation, and sale of natural gas is a "line of commerce" within the meaning of § 7. There can also be no doubt that California is a "section of the country" as that phrase is used in § 7. The sole question, therefore, is whether on undisputed facts the acquisition had a sufficient tendency to lessen competition or is saved by the findings that Pacific Northwest, as an independent entity, could not have obtained a contract from the California distrib-

state separately its conclusions of law.' We all know what has happened. Many courts simply decide the case in favor of the plaintiff or the defendant, have him prepare the findings of fact and conclusions of law and sign them. This has been denounced by every court of appeals save one. This is an abandonment of the duty and the trust that has been placed in the judge by these rules. It is a non-compliance with Rule 52 specifically and it betrays the primary purpose of Rule 52—the primary purpose being that the preparation of these findings by the judge shall assist in the adjudication of the lawsuit.

"I suggest to you strongly that you avoid as far as you possibly can simply signing what some lawyer puts under your nose. These lawyers, and properly so, in their zeal and advocacy and their enthusiasm are going to state the case for their side in these findings as strongly as they possibly can. When these findings get to the courts of appeals they won't be worth the paper they are written on as far as assisting the court of appeals in determining why the judge decided the case." Seminars for Newly Appointed United States District Judges (1963), p. 166.

utors, could not have received the gas supplies or financing for a pipeline project to California, or could not have put together a project acceptable to the regulatory agencies. Those findings are irrelevant.

As we said in *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 323: "Congress used the words '*may be* substantially to lessen competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act." See also *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 362.

Pacific Northwest, though it had no pipeline into California, is shown by this record to have been a substantial factor in the California market at the time it was acquired by El Paso. At that time El Paso was the only actual supplier of out-of-state gas to the vast California market, *a market that expands at an estimated annual rate of 200 million cubic feet per day.*[5] At that time Pacific North-

---

[5] California, in a brief *amicus curiae,* pp. 5–6, tells us:

"The dependence of California upon natural gas as a fuel is unique among the states. California does not possess coal deposits sufficient for energy requirements. It is dependent upon natural gas for its energy needs and approximately three quarters of the natural gas utilized in California comes from out-of-state sources. Ninety per cent of all homes in California are heated by natural gas and California industry depends upon natural gas as a fuel. In California the percentage of total energy provided by natural gas is substantially greater than for the nation as a whole.

"During 1962, California Gas distributing utilities purchased over 745,000,000,000 cubic feet of natural gas at a cost somewhat in excess of $266,850,000. California takes in excess of ten per cent of all of the natural gas moving in interstate commerce throughout the United States and exceeds the volume of gas imported by any other state.

"The interest of California in this proceeding is evident. More than 80 per cent of the customers of El Paso before merger resided in

west was the only other important interstate pipeline west of the Rocky Mountains. Though young, it was prospering and appeared strong enough to warrant a "treaty" with El Paso that protected El Paso's California markets.

Edison's search for a firm supply of natural gas in California, when it had El Paso gas only on an "interruptible" basis, illustrates what effect Pacific Northwest had merely as a potential competitor in the California market. Edison took its problem to Pacific Northwest and, as we have seen, a tentative agreement was reached for Edison to obtain Pacific Northwest gas. El Paso responded, offering Edison a firm supply of gas and substantial price concessions. We would have to wear blinders not to see that the mere efforts of Pacific Northwest to get into the California market, though unsuccessful, had a powerful influence on El Paso's business attitudes within the State. We repeat that one purpose of § 7 was "to arrest the trend toward concentration, the *tendency* to monopoly, before the consumer's alternatives disappeared through merger . . . ." *United States* v. *Philadelphia National Bank*, 374 U. S., at 367.

This is not a field where merchants are in a continuous daily struggle to hold old customers and to win new ones over from their rivals. In this regulated industry a natural gas company (unless it has excess capacity) must

the State of California and California ratepayers bear most of the costs of service of El Paso.

"California, alone, consumes more natural gas than the Middle Atlantic states combined, more than half as much as the highly industrialized, thickly populated East North-Central states of Illinois, Indiana, Michigan, Ohio and Wisconsin, and as much as the seven states that make up the West North-Central areas. Out-of-state deliveries to California averaged three billion cubic feet per day in 1961. At a price of slightly more than thirty cents per thousand cubic feet (Mcf), this business was worth then about $1,000,000 per day."

compete for, enter into, and then obtain Commission approval of sale contracts in advance of constructing the pipeline facilities. In the natural gas industry pipelines are very expensive; and to be justified they need long-term contracts for sale of the gas that will travel them. Those transactions with distributors are few in number. For example, in California there are only two significant wholesale purchasers—Pacific Gas & Electric in the north and the Southern Companies in the south. Once the Commission grants authorization to construct facilities or to transport gas in interstate commerce, once the distributing contracts are made, a particular market is withdrawn from competition. *The competition then is for the new increments of demand that may emerge with an expanding population and with an expanding industrial or household use of gas.*

The effect on competition in a particular market through acquisition of another company is determined by the nature or extent of that market and by the nearness of the absorbed company to it, that company's eagerness to enter that market, its resourcefulness, and so on. Pacific Northwest's position as a competitive factor in California was not disproved by the fact that it had never sold gas there. Nor is it conclusive that Pacific Northwest's attempt to sell to Edison failed. That might be weighty if a market presently saturated showed signs of petering out. But it is irrelevant in a market like California, where incremental needs are booming. That is underscored in the case by a memorandum dated October 18, 1956, which summarized a meeting at which terms of the acquisition were negotiated. It recited that Pacific Northwest had substantially concluded additional contracts for Canadian gas and that "Pacific plans on selling this additional volume of gas to the California market . . . ." On November 5, 1956, just three days prior to approval by the directors of Pacific Northwest of the

stock exchange, it made a firm offer to PGE to supply up to 350 million cubic feet a day for 20 years. Even after that approval and before the actual exchange, the chief executive of Pacific Northwest, writing November 22, 1956, said: "I do not think for the present moment we should confuse the sale of gas from our system to California with El Paso taking part of the gas through their present system to California. Reason for this should the El Paso-Pacific deal collapse we would have nothing of substance with California."

Pacific Northwest had proximity to the California market—550 miles distant in Wyoming, even nearer in Idaho, only 250 miles away in Oregon. Moreover, it had enormous reserves in the San Juan Basin, the Rocky Mountains, and western Canada. Had Pacific Northwest remained independent, there can be no doubt it would have sought to exploit its formidable geographical position *vis-à-vis* California. No one knows what success it would have had. We do know, however, that two interstate pipelines in addition to El Paso now serve California—one of the newcomers being Pacific Gas Transmission Co., bringing down Canadian gas. So we know that opportunities would have existed for Pacific Northwest had it remained independent.

Unsuccessful bidders are no less competitors than the successful one. The presence of two or more suppliers gives buyers a choice. Pacific Northwest was no feeble, failing company; [6] nor was it inexperienced and lacking in resourcefulness. It was one of two major interstate pipelines serving the trans-Rocky Mountain States; it had raised $250 million for its pipeline that extended 2,500 miles through rugged terrain. It had adequate reserves and managerial skill. It was so strong and militant that it was viewed with concern, and coveted, by El

---

[6] Cf. *International Shoe Co.* v. *Federal Trade Comm'n*, 280 U. S. 291.

Paso. If El Paso can absorb Pacific Northwest without violating § 7 of the Clayton Act, that section has no meaning in the natural gas field. For normally there is no competition—once the lines are built and the long-term contracts negotiated—except as respects the incremental needs.

Since appellees have been on notice of the antitrust charge from almost the beginning—indeed before El Paso sought Commission approval of the merger—we not only reverse the judgment below but direct the District Court to order divestiture without delay.[7]

*Reversed.*

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

## I.

Contrary to what I had first thought, the Government is not asking in this case, as it did in *United States* v. *Yellow Cab Co.*, 338 U. S. 338, that we "in effect . . . try the case *de novo*," *id.*, at 340. Rather it contends that on the undisputed facts of record the ultimate determination below was clearly erroneous. See *id.*, at 341–342. For reasons given in the Court's opinion, I agree that a violation of § 7 of the Clayton Act has been established, and that the District Court erred in deciding otherwise. On this score I shall comment only on two matters.

*First.* The Court's strictures concerning the District Court's findings seem to me to miss the mark. Findings of fact should, of course, be the product of the conscientious and independent judgment of the district judge. Nevertheless, if they are supported by evidence, they are not rendered suspect simply because the trial court, as

---

[7] Cf. *Wisconsin* v. *Illinois*, 281 U. S. 179, 197.

here, has accepted *in toto* the findings proposed by one side or the other. The real lack in this case is that the District Court wrote no opinion setting forth the reasoning underlying any of the subsidiary findings on disputed issues of fact or connecting the subsidiary findings with its ultimate determination that the Clayton Act had not been violated by this merger.

Both as a practitioner and as a judge I have more than once felt that a closely contested government antitrust case, decided below in favor of the defendant, has foundered in this Court for lack of an illuminating opinion by the District Court. District Courts should not forget that such cases, the trials of which usually result in long and complex factual records, come here without the benefit of any sifting by the Courts of Appeals. The absence of an opinion by the District Court has been a handicap in this instance.

*Second.* This case affords another example of the unsatisfactoriness of the existing bifurcated system of antitrust and other regulation in various fields. In this case, the Federal Power Commission had indicated its approval of this merger as being in the public interest. The Department of Justice, however, considered the merger to be violative of the antitrust laws and, for that reason alone, against the public interest. This Court, under the present scheme of things has no choice on this record* but to sustain the position of the Department of Justice, as indeed it has felt constrained to do, albeit in my view with less justification, in other recent cases involving dual regulation. Cf. *United States* v. *Philadelphia National Bank,* 374 U. S. 321; *United States* v. *First National Bank & Trust Co.,* decided today, *post,* p. 665, and my dissenting opinions in those cases. It would be unrealistic not to recognize that this state of affairs has

---

*This Court has not had the benefit of an *amicus* brief from the Federal Power Commission.

the effect of placing the Department of Justice in the driver's seat even though Congress has lodged primary regulatory authority elsewhere.

It does seem to me that the time has come when this duplicative and, I venture to say, anachronistic system of dual regulation should be re-examined. Had the subtle and necessarily speculative questions involved in assessing the short-term and long-term effects of this merger been subject to appraisal by a single agency, under congressionally established standards marking the relationship between the different and often competing objectives of the antitrust laws and those governing the regulation of "interstate" natural gas, who can say that this case might not have called for a different outcome?

## II.

While I agree with the Court's decision on the merits, I dissent from its peremptory ordering of divestiture. "The framing of" appropriate relief "should take place in the District rather than in Appellate Courts." *International Salt Co., Inc.*, v. *United States*, 332 U. S. 392, 400 (footnote omitted). *United States* v. *E. I. du Pont de Nemours & Co.*, 366 U. S. 316, is not to the contrary; that case had already been here before on the merits (353 U. S. 586), and when it came here again at the relief stage the Court observed that "the District Courts [have] the responsibility *initially* to fashion the remedy . . . ." 366 U. S., at 323. I know of no case where this Court has in the first instance itself directed divestiture or any other particular kind of relief. The fact that these appellees have been "on notice," *ante,* p. 662, of the charges against them affords no justification for this departure from normal practice. See the cases cited in the second *du Pont* case, 366 U. S., at 322.

I would remand the case to the District Court for the fashioning of appropriate relief.