UNITED STATES of America, Plaintiff,

v.

EL PASO NATURAL GAS COMPANY et al., Defendants.

Civ. A. No. C-2626.

United States District Court,
D. Colorado.

Nov. 2, 1978.

James W. Winchester, Asst. U. S. Atty., Denver, Colo., Linda L. Tedeschi, Deputy Atty. Gen., San Francisco, Cal., Stephen F. Sonnett, Kenneth L. Jost, and Anthony E. Harris, Washington, D. C., for plaintiff.

David K. Watkiss, Salt Lake City, Utah, Marshall Cox, New York City, and Thomas W. diZerega, Salt Lake City, Utah, for defendant, Northwest Energy Co.

William Owens, and Douglas K. Porter, Los Angeles, Cal., for defendant, Southern California Gas Co.

P. Dexter Peacock, Houston, Tex., for defendant, El Paso Natural Gas Co.

## OPINION AND ORDER

CHILSON, Senior District Judge.

### APPLICATION BY NORTHWEST ENERGY COMPANY FOR AMENDMENT TO VOTING TRUST AGREEMENT

Northwest Energy requests this Court's approval of an amendment to a voting trust agreement entered into between El Paso Company, Northwest Energy and the other interested parties.

A determination of whether or not the application should be granted requires a reference to the background of litigation in this action, beginning in July 1957, when the United States filed an antitrust action in the United States District Court for the District of Utah against El Paso Natural Gas Company (now El Paso) to require El Paso to divest itself of its acquisition of Pacific Northwest Pipeline Company (PNW) which it had acquired by acquisition of 99.8% of PNW's outstanding stock.

This litigation was the subject of five different opinions by the United States Supreme Court found in:

California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962);

United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964);

Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967);

Utah Public Service Commission v. El Paso Natural Gas Co., 395 U.S. 464, 89 S.Ct. 1860, 23 L.Ed.2d 474 (1969);

El Paso Natural Gas Co. v. United States, 410 U.S. 962, 93 S.Ct. 1440, 35 L.Ed.2d 697 (1973) (affirming 358 F.Supp. 820 (D.Colo. 1972)).

A summary of the facts leading to this litigation and its course is found in United States v. El Paso Natural Gas Company, D.C., 291 F.Supp. 3 (1968) and United States v. El Paso Natural Gas Company, D.C., 358 F.Supp. 820 (1972).

Due to the urgencies of the disposition of the matter now pending before the Court, the Court will not detail the course and background of this prolonged litigation but will briefly review the background which the Court deems pertinent to a discussion of the question before it.

In July 1957, the United States filed this action against El Paso in the Utah District Court, alleging in effect that the acquisition of control of PNW by El Paso was intended to prevent PNW from competing with El Paso for the natural gas market in California. The complaint was later amended to allege a violation of Section 7 of the Clayton Act. The United States requested that El Paso be required to divest itself of PNW to restore its competition in California.

While this action was pending, El Paso, opposed by California, obtained authority to merge PNW with El Paso from the Federal Power Commission. In 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54, the Supreme Court reversed the Commission's action and held that the Commission should not have proceeded on the merits of the merger application while the action in the Utah District Court was pending.

The Utah District Court proceeded with the trial of the government's antitrust action and ordered its dismissal. Upon appeal, the Supreme Court reversed and directed the District Court "to order divestiture without delay." 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12.

Upon remand to the Utah District Court, the United States and El Paso agreed to a divestiture decree which the District Court entered. The District Court had refused to permit Cascade Natural Gas Company and others to intervene and be heard.

Upon appeal the Supreme Court, in 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814, held that the District Court was in error in refusing the motions to intervene and found that the agreed decree did not comply with the Supreme Court's mandate that the District Court should "order divestiture without delay" as required in its opinion in 376

U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12. The Supreme Court stated: "No one, except this Court, has authority to alter or modify our mandate." 386 U.S. at 136, 87 S.Ct. at 937. The Supreme Court remanded the case to the District Court "___ with directions that there be divestiture without delay ___," 386 U.S. at 142, 87 S.Ct. at 940, ordered de novo hearings, and set forth certain guidelines for such hearings.

In the same opinion, the Court further stated:

"Our direction was that the District Court provide for 'divestiture without delay.'

"That mandate in the context of the opinion plainly meant that PNW or a New Company be at once restored to a position where it could compete with El Paso in the California market."

In accordance with this mandate, the District Court allowed all motions to intervene and after lengthy hearings entered a decree of divestiture which is found in 291 F.Supp. 3, which contains a detailed plan for such divestiture. Upon appeal, the Supreme Court in 395 U.S. 464, 89 S.Ct. 1860, 23 L.Ed.2d 474 held that the decree of the court did not comply with the Supreme Court's mandate as required by its previous decisions and stated:

"Our mandate directed complete divestiture. The District Court did not, however, direct complete divestiture. ___ Clearly this [the District Court's Decree] does not comply with our mandate." 395 U.S. at 471, 89 S.Ct. at 1863.

The Supreme Court further stated:

"The severance of all managerial and all financial connections between El Paso and the New Company must be complete for the decree to satisfy our mandate. Only a cash sale will satisfy the rudiments of complete divestiture." 395 U.S. at 472, 89 S.Ct. at 1864.

Upon remand, the District Court held further extensive evidentiary hearings and entered a new divestiture decree which is reported in 358 F.Supp. 820 (1972).

The divestiture decree entered by the District Court provided, among other things, the following:

"El Paso will transfer the divested assets to New Company and New Company will pay El Paso for the equity therein by issuing to El Paso all of the common stock of New Company. El Paso will sell to the successful applicant, 20% of the common stock of New Company, at a price to be negotiated by El Paso and the successful applicant, or if parties cannot agree, at a price to be fixed by the Court. "Concurrently, the remainder of the stock will be placed in a voting trust to be administered solely by the successful applicant. Participation certificates in the voting trust will be distributed pro rata to the holders of El Paso's common stock. The voting trust agreement will provide that a holder may surrender his participation certificates for the appropriate number of shares of New Company subject to restrictions designed to prevent El Paso stockholders from acquiring any shares of New Company stock and prevent El Paso's officers, directors, and members of their families from holding New Company stock.

"To the extent that participation certificates have not been surrendered at the end of five years, the remaining shares held in the voting trust shall be sold and the proceeds distributed to the holders of the remaining participation certificates." 358 F.Supp. at 833.

After the voting trust agreement was executed, El Paso Natural Gas Company became a wholly owned subsidiary of Northwest Energy. The voting trust agreement was amended accordingly and Northwest Energy stock was substituted for Northwest Pipeline stock as the trusteed stock under the voting trust.

Among other things, the voting trust agreement provides that although the participating certificates issued thereunder could be freely traded, the trusteed stock could be issued upon surrender of participating certificates only upon certification by affidavit that the certificate holder does

not beneficially own, control or hold, with power to vote, any of the issued and outstanding shares of common stock of El Paso.

The plan of divestiture to accomplish the purposes of the Supreme Court's various mandates to insulate the New Company from control or influence by El Paso, also contains certain restrictive provisions which provide that for a period of ten years:

"No person who is an officer or director of El Paso or of an El Paso affiliate shall be permitted while in office, to purchase or retain any of the common stock of Northwest; nor for a period of ten years from the closing date shall any person, who in the aggregate with members of his immediate family and with any person with whom he is acting in concert, agreement or understanding and with any person for whom or on whose behalf he is acting, beneficially owns, controls or holds with power to vote, either directly or indirectly, in excess of one-half of one percent (½ of 1%) of the then outstanding common stock of El Paso be permitted to purchase or retain any of the outstanding common stock of Northwest."

The trust agreement further provides that the voting trust would terminate on the earlier of the date on which all of the trusteed stock shall have been disposed of or February 7, 1979. If all of the trusteed stock is not disposed of by February 7, 1979, the voting trustee is directed by the agreement to close the transfer books of the voting trust and to sell the trusteed stock so remaining within three months thereafter. The proceeds of such sale less expenses shall be distributed to the holders of the participation certificates. Not less than three months prior to the closing of the transfer books, the voting trustee is required by the agreement to solicit by mail all persons who have not converted their participation certificates and urge them to convert their certificates.

This latter provision will become effective on November 7, 1978, and hence the urgencies in the determination of the approval or disapproval by the Court of the proposed amendment.

The plan of divestiture decreed by the District Court and approved by the Supreme Court has only partially been executed. Admittedly, the New Company has been restored to a position where it can compete with El Paso in the California market, but there still remains the requirements of the disposition of the trusteed stock and the policing by the Court of the restrictive provisions.

To eliminate the Court's requirement that the trusteed stock still remaining in the voting trust on February 7, 1979, shall be sold within three months thereafter, Northwest Energy, on September 24, 1978, filed its application for approval of an amendment of the voting trust agreement which in essence would extend the period of the trust for an additional five years from February 7, 1979, and permit an exchange of the trusteed stock for participation certificates irrespective of whether or not the holder of the participating certificates was an owner of common stock of El Paso. The proposed amendment would also permit the voting trustee to require the surrender of participation certificates in exchange for the trusteed stock by certain dates and by certain categories.

As grounds for the amendment, Northwest Energy states in its application:

"Unfortunately, exchange of Certificates for Northwest shares has not occurred on the scale anticipated and necessary to accomplish the objectives of the Court. Termination of the Trust as presently scheduled would require a public offering of approximately 1.68 million shares or approximately 39 percent of Northwest's total outstanding common stock. A forced sale of such magnitude would not only significantly depress the price of Northwest common stock to the financial detriment of Northwest's stockholders, but would also severely diminish demand for such stock. As a consequence, Northwest's ability to raise equity funds needed to finance certain important energy projects will be seriously undermined and its cost of capital increased. Thus, be-

cause of this unanticipated circumstance, termination of the Voting Trust as scheduled now threatens to jeopardize the primary objective of the divestiture proceedings, i. e., the establishment of a new company that can be a 'viable competitor' in the gas industry.

"While the threat to Northwest's financing ability is of principal concern, the forced sale of such a large block of stock in the short period of time provided will also be inconsistent with other objectives of the divestiture Decree. The sale will require a large public offering of stock with the attendant hazards and uncertainties that the divestiture plan was designed to avoid. While the sale probably can be accomplished unless market conditions are particularly adverse, the stock price will have to be substantially discounted below the current market which is already significantly less than book value. In order to achieve a reasonably broad distribution (albeit far narrower than the present Northwest distribution), a large underwriting group will have to be assembled commanding premium commissions to market this unprecedented percentage of the total stock of a company in a secondary offering. Participation Certificate holders will be financially damaged not only because of the depressed price and considerable expense of such a sale but also by reason of their being required to incur reinvestment costs and a capital gain at a time not of their own choosing. The broad ownership of Northwest shares will in any event be significantly narrowed, the share purchasers will obtain a windfall at the expense of Certificate holders, and there will be the risk of predatory efforts to acquire control by reason of the sudden excess supply of shares and resulting depressed market."

The amendment is opposed by the United States.

Northwest Energy and the United States have filed herein a stipulation of facts and exhibits, together with memoranda and briefs in support of and in opposition to the amendments. On October 25, 26, and 27, the Court held evidentiary hearings and heard argument of counsel.

During the course of the hearings, the Court raised the question of its authority to consider the proposed amendment for the following reasons:

The Court considers the Supreme Court decisions above referred to as the law of this case. The Supreme Court repeatedly referred to its decisions as being a "mandate." The Supreme Court repeatedly stated that its mandate "directed complete divestiture." It further stated "the severance of all managerial and all financial connections between El Paso and the New Company must be complete for the decree to satisfy our *mandate*. Only a cash sale will satisfy the rudiments of complete divestiture." The Court further stated, "No one, except this Court, has authority to alter or modify the *mandate*." (emphasis added)

The Supreme Court rejected the decree agreed to by the United States and El Paso designed to effect a divestiture as not being in compliance with the Supreme Court's mandate. Later the Supreme Court refused this Court's 1968 decree because it did not comply with the Supreme Court's mandate for a complete divestiture and a severance of all managerial and financial connections between El Paso and New Company. The Supreme Court, however, did approve this Court's 1972 decree, an integral part of which was the prohibition of the issuance of trusteed stock to owners of El Paso stock. This Court views this prohibition as a key component in the plan of divestiture in order to comply with the Supreme Court's mandate of a complete divestiture, including a severance of all financial connections between El Paso and the New Company, and an indispensable provision to accomplish the equivalent of a cash sale mandated by the Supreme Court.

The approval of this Court's 1972 decree is, in this Court's opinion, a mandate by the Supreme Court to carry out the plan of divestiture set forth in this Court's 1972 decree. In view of the Supreme Court's

specific statement that no one, except the Supreme Court, has authority to alter, modify or amend its mandate, the rules adopted by the Supreme Court in other cases permitting the District Court to alter or modify decrees in cases of changed circumstances and extreme hardship are not applicable. Nevertheless, this Court has considered the proposed amendment assuming that it does have authority to alter and modify its decree if it finds that the circumstances in evidence are of such a nature that they justify approval of the proposed amendment.

The facts and circumstances contained in the stipulation and the evidence received at the hearings, viewed in the light of the Supreme Court's decisions and the background of this case, do not justify the Court's approval of the proposed amendment for the following reasons.

Under the voting trust agreement, 80% or 2,792,935 shares of common stock of the New Company were deposited in the voting trust. As of August 18, 1978, 62.3% or 1,741,134 shares remained in the voting trust.

Because many El Paso and Northwest investors hold the participating certificates and their shares of Northwest and El Paso in brokers or nominee accounts and because many brokers and nominees will not reveal the individual identities or holdings, the number of Northwest shares and participation certificates held by El Paso shareholders cannot be definitely determined. But an analysis of Northwest's record of its stockholders showed that there were 3454 accounts owning both Northwest and El Paso stock, in the amount of 1,031,732 shares of Northwest and 11,781,622 shares of El Paso stock. With the brokerage and nominee accounts factored out, there were 2350 accounts owning 146,576 shares of Northwest stock and 531,028 shares of El Paso common stock.

An analysis based on social security numbers of a cross match of El Paso shareholders and participation certificate holders as of April 14, 1978, showed that 1,495,789 participation certificates, or 83% of the total certificates outstanding, were held in 70,647 El Paso shareholder accounts.

The stipulation indicates that under the proposed amendment, El Paso stockholders of record would receive a total of approximately 32% of Northwest's currently outstanding shares.

The government at page 7 of its memorandum filed in opposition to the amendment, states that the 32% of Northwest common stock would be held by El Paso stockholders controlling over 53% of the outstanding El Paso stock. The memorandum further states, "At a bare minimum then, the application would result in a majority of El Paso stockholders controlling 32% of Northwest common stock."

Without delving further into the incomplete statistics submitted by the opposing parties, it is clear and the Court finds that under the proposed amendment owners of approximately 50% of the outstanding stock of El Paso would own somewhere between 30 and 40% of the currently outstanding stock of Northwest. Northwest takes the position that this would not affect its independence and control of the management of Northwest, inasmuch as the Northwest stock in the hands of El Paso shareholders is widely held and much of it is owned by small stockholders. However, this Court is concerned with the public interest and the Supreme Court's mandate calling for a complete divestiture and a severance of all financial connections between El Paso and the New Company and the mandate that only a cash sale or its equivalent would fulfill the Supreme Court's mandate.

The Supreme Court in *Cascade* 386 U.S. at page 135, 87 S.Ct. at page 937, stated:

"In the present case protection of California interests in a competitive system was at the heart of our mandate directing divestiture. For it was the absorption of Pacific Northwest by El Paso that stifled that competition and disadvantaged the California interests. It was indeed their interests, as part of the public interest in a competitive system, that our mandate was designed to protect."

The Court concludes that the ownership or control of 32% of Northwest by persons owning or controlling 50% of the common stock of its competitor (El Paso) would not be in the public interest and would not be in accord with the Supreme Court's mandates.

This Court arrives at this conclusion even though it is admitted that a part of the Supreme Court's mandate has been accomplished, namely, that Northwest has become and is a viable company which has restored competition in the California market as well as serving the needs of its customers in the Pacific Northwest. Nor does the fact that Northwest has been a successful competitor of El Paso for natural gas supplies in Alaska to supply the demand for natural gas in California and elsewhere in the contiguous 48 states affect this Court's conclusion.

The Court repeats that it would not be in the public interest and would be in violation of the Supreme Court mandates to permit the voting power of 32% of Northwest's outstanding common stock to be lodged in the hands of El Paso stockholders.

The evidence concerning the effect of a sale of the trusteed stock as required by the present voting trust agreement is conflicting and speculative. The evidence discloses that the sale of the trusteed stock as required by the voting trust agreement *may* result in a reduction of the market price of Northwest stock, but at most this would be but one factor which might affect the market price and demand for Northwest stock and the price at which Northwest might market its securities to raise equity funds needed to finance its projects in the future. More important factors in this respect are the market conditions at the time Northwest markets its future securities, the historical and present earnings of Northwest, the interest rates prevailing at that time, and the amount of dividends then being paid on its common stock.

No one can predict what these factors will be in 1979 to 1982, when Northwest estimates it will need to obtain additional equity capital.

There is no evidence from which this Court can find that compliance with the present provisions of the voting trust agreement will destroy the financial integrity of Northwest or its position as a viable company with the potential to maintain its competitive position in the California market.

When the Apco group was selected as the successful applicant to acquire the divested assets through the Northwest Pipeline Company, it agreed to comply with the provisions of the 1972 decree, including the provisions of the voting trust agreement. It was not the intent of the plan that this Court should determine by what means Northwest would attempt to become a competitor in the California market, nor was there any indication in the plan that when Northwest established itself as a competitor in the California market that the other provisions of the plan would be altered or modified. In the Court's opinion, the responsibility of Northwest to carry out the provisions of the plan are first and paramount to any problems the plan might pose to the financing of future Northwest projects.

For the foregoing reasons, the Court determines that it should not approve the proposed amendment.

IT IS THEREFORE ORDERED that the application of Northwest to amend the voting trust agreement is hereby denied.