### In re COMBUSTION EQUIPMENT ASSOCIATES, INC., Debtor.

### Bankruptcy No. 80 B 11757.

United States Bankruptcy Court, S. D. New York.

Jan. 5, 1982.

Anderson, Russell Kill & Olick, New York City, for debtor.

Avrom S. Fischer, Brooklyn, N.Y., for Andrew Spiegel, Stockholder of CEA.

## MEMORANDUM OPINION

JOHN J. GALGAY, Bankruptcy Judge.

Combustion Equipment Associates, Inc. ("CEA"), debtor and debtor in possession, brought an application seeking authority to terminate the employment of Herbert Beningson effective March 3, 1981, to pay to him $75,000 in full satisfaction of any and all post-petition claims against the estate and to withdraw CEA's notice of motion dated March 2, 1981 insofar as that motion sought approval of an agreement with Mr. Beningson relating to termination of his employment.

The Committee of Unsecured Creditors, The Committee of Creditors Claiming Security, The Committee of Equity Security Holders and The Securities and Exchange Commission has no objection to CEA's application. The United States Trustee took no position with respect thereto. The sole opposition to the application was from one Andrew Spiegel, a shareholder of CEA owning no more than $2,000 worth of CEA stock. Mr. Spiegel is plaintiff in a class action commenced on September 18, 1980, and pending in the United States District Court for the Southern District of New York. Pursuant to Section 362(a) of the Bankruptcy Code, the action is stayed; no application has been made in this Court to lift the stay. The plaintiff purports to represent all shareholders of record of CEA from whom proxies were solicited for the election of directors and approval of an amendment to CEA's 1973 Special Stock Option Plan. Plaintiff has alleged that CEA and its defendant directors solicited

votes for approval of this plan through the use of false and misleading proxy statements in contravention of rules promulgated under the Securities Exchange Act of 1934.

After a hearing on debtor's application, the Court directed the debtor and Mr. Spiegel to submit proposed findings of fact and conclusions of law, pursuant to Bankruptcy Rule 752, and to serve same on all interested parties. The debtor submitted extensive findings and conclusions; Mr. Spiegel found it necessary to submit only a small number of supplemental findings and conclusions.

The Court is well aware of the instruction of the United States Supreme Court in *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656–7, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964), in which trial courts are cautioned to avoid slavish adherence to proposed findings and conclusions submitted by a party.

The Court has considered the debtor's application and Mr. Spiegel's opposition, the evidence presented at the hearings on the matter, all the papers submitted by the parties and the applicable law. In this opinion, the Court has adopted the findings and conclusions submitted by the debtor, modified in part after consideration of the supplemental findings and conclusions submitted by Mr. Spiegel. The debtor's findings and conclusions, modified as noted, accurately state and reflect the true state of the record. Therefore, judicial time and resources would be wasted by the Court's efforts to rephrase proposed findings and conclusions so accurately stated.

### FINDINGS OF FACT

On October 20, 1980, CEA and two of its subsidiaries, the Hart-Carter Company ("Hart-Carter") and Siemon Manufacturing Company, filed petitions for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The Court has assumed jurisdiction over the assets of these companies which continue to operate their businesses and manage their properties as debtors in possession subject to the supervision and orders of the Court.

CEA was formed in 1953 for the purpose of engineering and marketing combustion control systems for steam generators and other fuel burning equipment. In 1961, CEA began the development and marketing of scrubbers and controls for incinerators in residential and commercial buildings. In 1968, CEA commenced the development of pollution control systems for industrial customers. In 1969, CEA augmented its manufacturing and marketing capabilities relating to Combustion Systems through the acquisition of the Todd Products Division business of Todd Shipyards Corporation. On February 28, 1973, CEA acquired Hart-Carter and its subsidiaries.

Prior to the bankruptcies, the business of CEA was divided into four major segments:

(i) The Environmental Systems Group which designs, constructs and operates large-scale facilities that abate pollution on energy producing products such as power plan scrubbers, and which recycle wastes and produce energy, such as resource recovery products;

(ii) The Energy Products and Services Group which designs, manufactures and markets products which convert fuels to heat energy and also markets forms of fuels, such as low-grade coal and waste oils;

(iii) The Environmental Products Group which designs, manufactures and markets air pollution control products and systems and materials separation, classification and pneumatic handling equipment; and

(iv) The Agricultural Products and Other Group which designs, manufactures and markets farm components and implements related to the harvesting and drying of organic materials.

As a result of CEA's continued severe cash shortage since the filing of the Chapter 11 petitions and its inability to obtain required financing for new projects and contracts in progress, as well as necessary performance bonds, CEA has been forced to discontinue its Environmental Systems business.

In the early 1970s, CEA agreed to construct and thereafter agreed to operate a waste disposal/resource recovery facility in Massachusetts (the "Brockton Project") which has provided waste disposal services to a group of local municipalities since 1973. The Brockton Project has utilized a combination of incineration, conversion to refuse-derived fuel, landfill, and, intermittently since 1977, Eco-Fuel, a proprietary powder-like fuel which is manufactured from organic solid waste and can be used as a substitute for, or in combination with, fossil fuels. CEA in 1973 and 1974 solicited additional resource recovery contracts, with some success.

In March, 1976, CEA intensified its efforts in the resource recovery business. Through a new subsidiary, CEA formed a joint venture with a subsidiary of Occidental Petroleum Corporation to construct and operate a resource recovery facility for the State of Connecticut in Bridgeport. The facility was designed to convert wastes into Eco-Fuel II. CEA itself was designated as the subcontractor for the joint venture and undertook to construct the plant and render it operational. This project, known as the "Bridgeport Project," consumed enormous amounts of cash without achieving operational acceptance. (As of the filing date of CEA's Chapter 11 petition, CEA had already expended in excess of $75,000,000 on construction, which was not even then fully completed in accordance with contract specifications. It was this project which broke the camel's back and caused CEA and two of its subsidiaries to file for protection under Chapter 11 of the Bankruptcy Code.)

The Bridgeport Project became an albatross around CEA's neck and, in December 1980, CEA obtained a judgment of this Court permitting it to reject as onerous and burdensome its executory subcontract relating thereto. The judgment provided among other things that the Project was to be transferred in an orderly fashion to CEA's co-venturer. Both the Bridgeport and Brockton Projects involved substantial amounts of Herbert Beningson's time, prior and subsequent to the Chapter 11 filings.

Mr. Beningson, whose brother Robert is the founder of CEA, was first employed by the company in late September, 1955. Except for military leave, he has been employed continuously by CEA from that time to the present. He is an engineer with a Bachelor of Mechanical Engineering degree from Rensselaer Polytechnic Institute [Tr. 8–9; references are to the transcript of the hearing held on August 27, 1981].

Herbert was his brother Robert's first employee. He has performed numerous services for CEA including, in the early years, engineering, drafting, supervising those two functions and managing CEA's manufacturing operations. [Tr. 8]. In recent years, he has been responsible for the worldwide research and development for CEA and its subsidiaries. He was also in charge of a number of operating divisions of CEA and the subsidiaries confirming those divisions. The presidents of these subsidiaries reported directly to him [Tr. 10–11, 40].

Mr. Beningson has held numerous titles during his employment with CEA including Chief Engineer, Vice President, Vice President of Engineering (for both CEA and certain subsidiaries), Senior Vice President and, finally, Executive Vice President [Tr. 8]. Mr. Beningson assumed the last title in 1978, resigning therefrom in February 1981, and continuing as an employee, but not as an officer, of CEA [Tr. 10].

Prior to CEA's going public, which occurred in 1968, Mr. Beningson was elected as a director of CEA. He remained in such position until August 10, 1981, when he was terminated in contemplation of this Court's approval of an agreement between CEA and United National Corporation ("United") pursuant to which United would loan certain funds, up to a maximum of $16,000,000, to CEA in return for stock options and the right to name a number of directors to CEA's board [Tr. 9–10].

Subsequent to the filing of CEA's Chapter 11 petition on October 20, 1980, Mr. Beningson continued to render the substantial services which he rendered prior to the bankruptcy. In particular, he was called

upon to supervise CEA's technical development staff, to oversee the Brockton and Bridgeport Projects as well as other resource recovery projects, to coordinate the research and development efforts and to supervise the presidents of certain subsidiaries [Tr. 11, 41]. Among the people who were reporting directly to Mr. Beningson were Michael Magoulas, Vice President in charge of Engineering and Construction, who was responsible for all Eco-Fuel operations; the president of the Energy Group, which comprised four subsidiaries; and the director of research and development [Tr. 12].

Mr. Beningson reported for work at CEA daily between October 20, 1980, when the Chapter 11 petition was filed, and February, 1981, when he resigned the office of Executive Vice President [Tr. 12]. Subsequent to his resignation as Executive Vice President, he continued to provide services to CEA in the form of advice and consultation respecting areas over which he formerly had responsibility, including recommendations concerning renewals of licenses and patents world-wide [Tr. 11–12, 38]. In addition, Mr. Beningson spent twelve days in May, 1981, preparing for and traveling to England and Germany on CEA's business [Tr. 37]. The trip to England was occasioned by a request made by prospective licensees for Eco-Fuel who had conceived two possible uses for the Eco-Fuel process in London and Manchester as to which they needed an expert opinion of feasibility and estimates of capital expenditures and operating German licensee for Eco-Fuel in solving certain technical problems [Tr. 37].

In 1980, some time prior to May, Mr. Beningson's annual salary was raised from $110,000 to $125,000 [Tr. 14–15, 42]. In May, 1980, CEA offered him an employment agreement which confirmed his salary increase [Tr. 13–14]. The agreement provided, among other things, that he would perform whatever services were designated by CEA's Chief Executive Officer and that he would serve as Executive Vice President, all until Mr. Beningson attained age 55 (he was 46 at the time) [Debtor's Exhibit 1 ¶¶ 1 and 2; Tr. 14].

The agreement further provided that Mr. Beningson would be paid a salary of $125,-000 a year through March 31, 1981, increased to $150,000 for the subsequent year and $175,000 for the following year [Debtor's Ex. 1, ¶ 3; Tr. 15]. There was also a provision for deferred compensation of $20,-000, as adjusted in succeeding years by the Consumer Price Index, which was to be placed in trust for Mr. Beningson [Debtor's Ex. 1, ¶ 17; Tr. 15].

The expressed purpose of the employment agreement was to fix a rate of pay and establish deferred compensation for Mr. Beningson [Debtor's Ex. 1, "Whereas" clauses; Tr. 15]. It was stated in Paragraph 8 to be supplemental to other employee benefits: "Nothing contained herein shall be deemed to exclude the Employee from any supplemental compensation, bonus, pension, insurance, severance pay or other benefit to which otherwise he might be or might become entitled as an employee of the Company."

Whereas no subpoenas were served and no minutes were produced of meetings of the board of directors or the compensation committee, it was Mr. Beningson's testimony that entry into the employment agreement was approved by the board of directors at the recommendation of the compensation committee of the board, which committee is composed of outside directors of the company [Tr. 35]. Herbert Beningson did not recall whether any minutes of CEA's Board of Directors which he had seen specifically approved his employment agreement; he never saw any minutes of the Compensation Committee and did not know what they might contain [Tr. 27, 35–36].

CEA publishes standard termination and vacation pay policies in a company manual [Debtor's Exhibit 23; Tr. 42]. A variety of benefits is provided to CEA employees including hospitalization and medical coverage, vacation arrangements, severance pay, a profit-sharing plan and a stock option plan [Tr. 43]. Termination pay is calculated on the basis of longevity and position; man-

agers and corporate executives are entitled to one week's pay for each year of service [Tr. 43; Debtor's Exhibit 2 at page 16]. Vacation pay upon termination also depends upon longevity; if an employee has given at least one year's service he is entitled to vacation pay earned less vacation actually taken. If the employee has worked 17 years for CEA, the July 1 following the 17th anniversary he is entitled to 20 working days per year [Tr. 43–44; Debtor's Exhibit 2 at page 13]. Employees of CEA discharged subsequent to the filing of the Chapter 11 petition have received accrued vacation and termination payments consistent with the benefits manual [Tr. 44].

Just prior to the filing of the Chapter 11 petition, Mr. Beningson voluntarily deferred additional salary, taking payment on the basis of $110,000, rather than $125,000, although his employment contract confirmed the higher salary [Tr. 16].

In February, 1981, CEA entered into an agreement with Mr. Beningson, subject to the approval of this Court, for the termination of his employment. That agreement provided that in lieu of any and all claims for compensation, he would accept termination and vacation pay in the amount of $70,000 payable in six equal monthly installments; and that he would make himself available as a consultant at the rate of $8,000 a month for the first three months and $4,000 a month for the following six months payable in equal monthly installments [Tr. 17]. By notice of motion dated March 2, 1981, CEA sought this Court's approval for the termination agreement but in the face of strenuous opposition from its creditors, centered largely on the proposed consulting arrangement, CEA did not press its motion [Tr. 18; Application, ¶ 8]. In conjunction with execution of the termination agreement, in early February, 1981, Mr. Beningson ceased reporting to CEA on a daily basis and resigned his position as Executive Vice President, although he continued to perform the substantial consulting services set forth above.

Between October 20, 1980 and February 7, 1981, when he received his last salary payment, Mr. Beningson was paid on the basis of the reduced salary, that is, $110,000 per annum [Tr. 16, 46]. He was not paid any of the deferred compensation provided in the employment contract [Tr. 16–17, 45]. Subsequent to February 7, 1981, he was paid $2,400 for his twelve days of consulting work, at the rate of $200 per day [Tr. 16, 46]. This rate was consented to by the creditors' committees and approved by the Court at a hearing on March 17, 1981, without prejudice to the parties' rights [Transcript of March 17, 1981 at pages 38–41]. Mr. Beningson knew that this rate of payment had received the Court's approval [Tr. 26].

Mr. Beningson has agreed to accept the lump sum of $75,000 in full satisfaction of his post-petition claims against the estate figured on a basis of a termination date of March 3, 1981, although he calculates his post-petition claim as approximately $160,-000 [Tr. 18–19, 53]. If Mr. Beningson were to be paid post-petition salary, termination and vacation pay calculated on the basis of a $110,000 salary and a termination date of March 3, 1981, he would be entitled to $78,-761, not including any deferred compensation which would increase the total by $7,200 [Tr. 44–45]. Absent an agreement to calculate salary, vacation and termination benefits for Mr. Beningson using a date of March 3, 1981, Mr. Beningson would, as of July 24, 1981, be entitled to $167,300 [Tr. 45–46]. Mr. Beningson will reserve his right to file against the estate a claim for pre-petition accrued vacation and salary, which CEA calculates at approximately $4,000, and will reserve the right to participate in CEA's profit-sharing plan, along with all other employees [Tr. 4–5, 46].

The $75,000 to be paid to Mr. Beningson is without prejudice to the parties' rights to contest any pre-petition claim or the interpretation or validity of the employment agreement with Mr. Beningson. Mr. Beningson will execute a release in favor of CEA. CEA will not give him any release [Tr. 4–5; Application, ¶ 11].

Aside from his salary and reimbursement of expenses, Mr. Beningson has not received

any other payment from CEA within the twelve months prior to the filing of its Chapter 11 petition [Tr. 19, 47]. He has not received any transfers of property from CEA or been granted any liens by CEA in connection with its property during the same period of time [Tr. 19–20, 47]. He does not owe any money to CEA [Tr. 47].

Mr. Beningson has not been discharged by CEA; his employment contract has never been abrogated by CEA; and his termination agreement has not been fulfilled by CEA [Tr. 18]. He has no other employment and is experiencing a severe liquidity problem [Tr. 40]. His wife is not employed and he supports his own two children, who are in college, as well as his niece and nephew, one of whom he has just put through college and the other one of whom is presently in college [Tr. 21].

### CONCLUSIONS OF LAW

Mr. Beningson's contract of employment is an executory one which has never been rejected pursuant to Section 365 of the Bankruptcy Code. 11 U.S.C. § 365 (the "Code").

Mr. Beningson rendered substantial services to CEA subsequent to the filing of its Chapter 11 petition, the benefits of which services CEA accepted and received. Accordingly, in keeping with the decisions of the Second Circuit in *Zelin v. Unishops, Inc. (In re Unishops)*, 553 F.2d 305 (2d Cir. 1977), and *Straus-Duparquet Inc. v. Local Union No. 3*, 386 F.2d 649 (2d Cir. 1967), Mr. Beningson is entitled to receive the benefits of his employment agreement and the employment manual.

Since CEA never rejected the employment agreement, Mr. Beningson's post-petition claims might arguably be continuing to the present although salary payments were suspended by this Court without prejudice last March. If CEA were to reject the employment agreement, it would still be obligated, at the least, to pay to Mr. Beningson the benefits provided in the company's employment manual, namely, accrued vacation and termination pay. This Court would then have to determine the amount of Mr. Beningson's post-petition salary claim. Moreover, Mr. Beningson would then be entitled to file against the estate, under Section 502(b)(8) of the Code, a claim for damages from the rejection, specifically, one year's compensation from the date of the filing.

In order to resolve Mr. Beningson's claims it would be necessary to engage in substantial litigation respecting the date of termination of his employment, levels of compensation and services rendered. The lump sum payment proposed to this Court obviates the need for this litigation, reserves to the debtor, the creditors and the equity security holders all of their rights to challenge any pre-petition claim which Mr. Beningson may file, sets no precedent with respect to the validity of employment agreements into which CEA may have entered, and waives Mr. Beningson's rights to receive any post-petition payments in excess of $75,000 or any pre-petition damages from rejection of his employment agreement.

Pursuant to Sections 191, 198-a and 198-c of the New York Labor Law, CEA is obligated to pay Mr. Beningson's salary and to make payment to Mr. Beningson in accordance with existing company policies of termination and vacation pay benefits; CEA's responsible officers could be subject to criminal prosecution as well as civil suit under these sections of the Labor Law if payments are not made.

For the reasons stated above, the application is granted as being in the best interests of the estate, its creditors and its equity security holders.